# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | § | |
| STEPHEN DEAN, | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 4:14-CV-203 |
| | § | |
| v. | § | Judge Mazzant |
| | § | |
| PARAMEDICS PLUS, LLC, | § | **Jury Trial Requested** |
| EAST TEXAS MEDICAL | § | |
| CENTER REGIONAL HEALTHCARE | § | |
| SYSTEM, INC., EAST TEXAS MEDICAL | § | |
| CENTER REGIONAL HEALTH | § | |
| SERVICES, INC., EMERGENCY | § | |
| MEDICAL SERVICES AUTHORITY, | § | |
| and HERBERT STEPHEN WILLIAMSON, | § | |
| | § | |
| Defendants. | § | |

## THE COMPLAINT OF THE UNITED STATES IN PARTIAL INTERVENTION

1.     The United States, on behalf of the United States Department of Health and

Human Services (HHS) and its component agency, the Centers for Medicare and Medicaid

Services (CMS), partially intervenes in this action, incorporates the allegations in Relator's

Complaint, and brings claims against Defendants Paramedics Plus, LLC ("Paramedics Plus"),

East Texas Medical Center Regional Healthcare System, Inc. ("ETMC System"), East Texas

Medical Center Regional Health Services, Inc. (together with ETMC System, "ETMC"),

Emergency Medical Services Authority ("EMSA"), and Herbert Stephen Williamson

("Williamson") (together, "Defendants") for its causes of action alleged as follows:

## INTRODUCTION

2.      This is an action under the False Claims Act, 31 U.S.C. §§ 3729-3733 *et seq*. and the common law to recover millions of dollars in damages and civil penalties from Defendants for knowingly submitting, or causing to be submitted, false claims to Medicare and the Oklahoma Medicaid program.

3.      Beginning in 1998 and ending in 2013, Defendants engaged in a kickback scheme designed to control the award of a lucrative public ambulance contract in the State of Oklahoma. Paramedics Plus and its parent company ETMC—both Texas entities—offered and paid EMSA—a public organization established by a trust indenture under Oklahoma law—over $20 million to obtain, and then retain, an ambulance services contract with EMSA.   In addition to paying over $20 million in cash kickbacks to EMSA, Paramedics Plus and ETMC also paid bribes and kickbacks to EMSA employees in the form of cash and gifts.  Defendants purposefully omitted the terms of the kickback arrangement from all written contracts between EMSA and Paramedics Plus, and concealed the kickbacks from the public.

4.      EMSA, established in 1977, operates a Public Utility Model of ambulance services in Tulsa and Oklahoma City.  EMSA describes itself as Oklahoma's largest provider of pre-hospital emergency care.  A public entity operated by public employees, EMSA owns or leases ambulances, but does not employ drivers, emergency medical technicians (EMTs), or paramedics.  Instead, EMSA contracts with a private contractor for drivers, EMTs, paramedics, and other personnel that actually perform health care services.  EMSA then bills Medicare, Oklahoma Medicaid, private payors, and patients for the services provided by its contractor's personnel.

5.      EMSA operates as a public middleman between Oklahoma citizens and the contracted provider of ambulance services.  In that role, EMSA controls the selection of the private contractor whose employees transport, treat, and care for Oklahoma residents, many of whom are beneficiaries of Medicare and the Oklahoma Medicaid program.  EMSA bills tens of millions of dollars each year to Medicare and Oklahoma Medicaid for the ambulance services provided by its contractor.

6.      From 1994 through 1998, EMSA's contractor was American Medical Response (AMR), one of the largest for-profit ambulance companies in the United States.  In 1997, EMSA issued a Request for Proposal ("RFP") to determine whether another contractor could provide the same or better services as AMR at a lower cost.  Public entities are often legally required to issue RFPs to help ensure (1) the appropriate use of taxpayer funds, (2) open and transparent contracting processes, and (3) fair competition for public contracts.

7.      In or around 1997, EMSA's President, H. Stephen Williamson, attended an ambulance industry conference in Florida.  At some point, Williamson met Anthony Myers, an executive at ETMC, a not-for-profit health care system headquartered in Tyler, Texas.  At the time, ETMC operated an acute-care hospital in Tyler and also ran its own ambulance business in Texas under the ETMC name.  Myers and Williamson devised a scheme by which ETMC would create a new, for-profit company to displace AMR as EMSA's ambulance services contractor in Oklahoma.  In exchange, the new ETMC-created company would kick back part of its proceeds to EMSA and Williamson.

8.      In furtherance of the scheme, on June 22, 1998, ETMC formed a new Texas limited liability company, "Paramedics Plus, LLC," an entity with no history of providing

3

ambulance services in Oklahoma or anywhere else.  Among Paramedics Plus's original four managers were Myers and Elmer Ellis, ETMC's President and Chief Executive Officer.

9.      On or around September 23, 1998, EMSA announced that it was dropping AMR and awarding its multi-million-dollar ambulance services contract to Paramedics Plus, the brand-new company from Tyler, Texas that had never provided ambulance services before.  On October 26, 1998, EMSA and Paramedics Plus entered into a written contract whereby Paramedics Plus would furnish, on EMSA's behalf, emergency and non-emergency ambulance services in and around Oklahoma City and Tulsa.  The contract did not say anything about the kickback arrangement between Myers and Williamson.  Defendants did not mention it because they knew it was illegal.

10.      In order to keep the contract and the attendant revenue, over the next 15 years, ETMC and Paramedics Plus continued to pay kickbacks and engaged in other illegal activity at the request of EMSA officials,  paid for certain costs incurred by EMSA, made political contributions to Oklahoma politicians at Williamson's behest, paid millions of dollars in bribes to EMSA and Williamson at key moments, including leading up to and on the date of a critical contract extension in 2008, gave EMSA interest-free cash payments and loans, and showered EMSA employees, including Williamson, with expensive gifts.

11.      Defendants later called the illegal kickback arrangement a "profit cap," in hopes of giving it an air of legitimacy.[1]  In fact, when ETMC and Paramedics Plus realized how much money could be made from buying public ambulance contracts, they offered similar kickback deals to public entities in California, Florida, and Indiana.  Paramedics Plus later claimed in its

---

[1] The phrase "profit cap" is notably absent from EMSA's RFPs, ETMC's 1998 bid, the EMSA contract, and all modifications of the EMSA contract.

marketing materials that it was giving money back to the communities by paying cash to the public entities that award it contracts.

12.    For over a decade, Defendants never reduced the supposed "profit cap" to writing, and they never formalized when the payments would be made or how they would be calculated. Instead, ETMC and Paramedics Plus simply paid huge sums of money to EMSA (often in conspicuously rounded amounts) whenever EMSA asked or whenever ETMC and Paramedics Plus had something to gain (such as a contract renewal).  Williamson even instructed ETMC and Paramedics Plus to pay Oklahoma politicians, noting that the payments would be booked "against the profit cap."  Defendants set up a slush fund to conceal the extent of the kickbacks from EMSA's Board of Trustees.  Williamson too deceived a Board member when asked about Paramedics Plus's political contributions to Oklahoma politicians.

13.    Following unfavorable media reports in 2012 regarding the relationship between EMSA and Paramedics Plus, EMSA's Board of Trustees requested that an auditor from the State of Oklahoma examine the allegations of misconduct.  Anticipating the auditor's arrival in September 2012, Williamson asked EMSA's law firm to prepare a ghostwritten letter, placed on Paramedics Plus's letterhead, purportedly documenting the illegal profit-sharing arrangement. The letter was purposefully undated, contained false information, and was hastily placed in EMSA's records before the audit began.  Paramedics Plus's President Ron Schwartz apparently signed the letter, endorsing its false representations.

14.    From 2006 through 2013, ETMC and Paramedics Plus received approximately $45 million in profit under the EMSA contract.  ETMC and Paramedics Plus kicked back nearly half of this profit (over $20 million) to EMSA—all under a concealed arrangement designed to ensure that Paramedics Plus kept the lucrative ambulance services contract.

15.     Defendants' conduct violated the Anti-Kickback Statute and the False Claims Act.  The ambulance services claims submitted by EMSA to Medicare and the Oklahoma Medicaid program resulted from kickbacks that ETMC and Paramedics Plus paid to EMSA and its employees, including its president, H. Stephen Williamson.  Consequently, the Medicaid and Medicaid claims for ambulance services were false and not payable.

16.     The United States brings this action to recover the damages suffered as a result of Defendants' illegal conduct as well as for appropriate civil penalties.

## PARTIES

17.     Plaintiff is the United States of America, on behalf of HHS and its component agency, CMS, the governmental agency that administers the Medicare Program and jointly funds the various state Medicaid programs.

18.     Relator Stephen Dean is a resident of Beaverton, Oregon.  Relator originally filed this action under the *qui tam* provisions of the False Claims Act.

19.     The ETMC System is a Texas nonprofit corporation headquartered in Tyler, Texas, that owns and operates a number of health care facilities, including an acute-care hospital located in Tyler, Texas.  ETMC System transacted business in the Eastern District of Texas during the relevant time frame of this action.  ETMC System may be served through its registered agent, Elmer G. Ellis, at 1000 South Beckham Avenue, Tyler, Texas 75701.

20.     ETMC Services is a Texas for-profit corporation headquartered in Tyler, Texas, that is affiliated with ETMC System.  ETMC Services transacted business in the Eastern District of Texas during the relevant time frame of this action.  ETMC Services may be served through its registered agent, Elmer G. Ellis, at 1000 South Beckham Avenue, Tyler, Texas 75701.

21.     Paramedics Plus is a Texas limited liability company and for-profit subsidiary of

ETMC.  Paramedics Plus is governed by a Board of Managers, which includes ETMC officers

Elmer Ellis (Chairman of Paramedics Plus), Ronald Schwartz (President of Paramedics Plus),

and Byron Hale (Chief Financial Officer and/or Secretary of Paramedics Plus).  Mr. Ellis is also

the President and Chief Executive Officer of ETMC.  Mr. Schwartz is also the Vice President

and Chief Operating Officer of another ETMC affiliate named ETMC-EMS.  Mr. Hale is also the

Chief Financial Officer and Senior Vice President of ETMC.  Paramedics Plus's principal office

is located in Tyler, Texas, and Paramedics Plus transacted business in the Eastern District of

Texas during the relevant time frame of this action.  Paramedics Plus may be served through its

registered agent, Elmer G. Ellis, at 1000 South Beckham Avenue, Tyler, Texas 75701.

22.     EMSA is an Oklahoma public trust created by trust indenture on December 1,

1977.  An Amended and Restated Trust Indenture became effective March 1, 1990.  The cities of

Tulsa and Oklahoma City are beneficiaries of the EMSA trust.  EMSA is operated by public

employees and provides, through the services of a contractor, emergency and non-emergency

transport services in and around Tulsa and Oklahoma City.  EMSA then bills Medicare,

Oklahoma Medicaid, private payors, and patients for services provided by its contractor's

personnel.  EMSA transacted business in the Eastern District of Texas during the relevant time

frame of this action.  EMSA may be served at 1111 Classen Drive, Oklahoma City, Oklahoma

73103, 1417 N. Lansing, Tulsa, Oklahoma 74106, and through its beneficiaries, Oklahoma City

and the City of Tulsa.

23.     Herbert Stephen Williamson is an individual resident of Oklahoma.  Williamson

transacted business in the Eastern District of Texas during the relevant timeframe of this action.

Williamson currently resides in Tulsa, Oklahoma, and can be served at 1111 Classen Drive, Oklahoma City, Oklahoma 73103 or 1417 N. Lansing, Tulsa, Oklahoma 74106.

## RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

24.     Defendants Paramedics Plus and ETMC are affiliated entities governed and controlled by the same individuals and whose operations are inextricably intertwined. Specifically, these Defendants share common management, finances, control, and supervision. Paramedics Plus and ETMC acted in concert to facilitate and cause the submission of false claims to the United States.  Paramedics Plus and ETMC are jointly and severally liable for the actions of the other.  Paramedics Plus and ETMC are also vicariously liable for the actions of their executives, other employees, and agents.

25.     Defendant EMSA is similarly vicariously liable for the actions of its President, Herbert Stephen Williamson, and its other employees and agents.

## JURISDICTION AND VENUE

26.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733.

27.     Jurisdiction over this action is conferred upon this Court by 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

28.     The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a).

29.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c) because some of Defendants can be found in, and many of the acts complained of occurred within, the Eastern District of Texas.

## BACKGROUND

### A.    The Anti-Kickback Statute and the False Claims Act

30.    The False Claims Act establishes liability to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," § 3729(a)(1)(A); or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," § 3729(a)(1)(B); or conspires to commit a violation of the False Claims Act, § 3729(a)(1)(C).[2]  "Knowingly" is defined to include actual knowledge, reckless disregard, and deliberate ignorance, § 3729(b)(1). The False Claims Act does not require proof of specific intent to defraud in order to establish a violation.  *Id.*

31.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), is a criminal statute that makes it illegal for individuals or entities to knowingly and willfully solicit or receive "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . . in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b)(1).

32.    The Anti-Kickback Statute also makes it illegal for individuals or entities to knowingly and willfully offer or pay "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good,

---

[2] In May 2009, the False Claims Act was amended pursuant to the Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA").  Section 3729(a)(1)(A) was formerly Section 3729(a)(1), Section 3729(a)(1)(B) was formerly Section 3729(a)(2), and Section 3729(a)(1)(C) was formerly Section 3729(a)(3).

facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

33.    The Anti-Kickback Statute further prohibits the solicitation, receipt, offer, and payment of any remuneration in exchange for referrals of individuals for services or items reimbursed in whole or in part by a Federal health care program.  42 U.S.C. § 1320a-7b(b).

34.    Cash payments by an ambulance company to municipal entities to induce the entities to contract with the ambulance company for services reimbursed with federal health care funds constitute illegal remuneration under the Anti-Kickback Statute.  Violation of the Anti-Kickback Statute is a felony punishable by fines and imprisonment.  42 U.S.C. § 1320a-7b(b)(2).

35.    The Anti-Kickback Statute arose out of Congress's concern that health care decisions such as referrals and contracting arrangements would be inappropriately bought through the payment of remuneration (*i.e.*, things of value), which would undermine the goals of ensuring fair competition for federal funds and providing the highest quality of health care to patients in a market driven by quality of care, not financial incentives.  To protect the Medicare and Medicaid programs, among other federal health care programs, Congress enacted a prohibition against the payment of kickbacks in any form.  Congress has strengthened the Anti-Kickback Statute on multiple occasions since its enactment to ensure that kickbacks masquerading as legitimate transactions do not evade the statute's reach.

36.    As amended by the Patient Protection and Affordable Care Act of 2010 ("ACA"), Pub. L. No. 111-148, § 6402(f), the Anti-Kickback Statute now provides that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]."  42 U.S.C. § 1320a-7b(g).  According to the ACA's legislative history, this amendment to the Anti-Kickback Statute was intended to

clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves."  155 Cong. Rec. S10854.

37.     The United States Department of Health and Human Services Office of Inspector General (HHS-OIG) has promulgated "safe harbor" regulations that identify payment practices that are not subject to the Anti-Kickback Statute because such practices are unlikely to result in fraud or abuse.  *See* 42 C.F.R. § 1001.952.  Safe harbor protection is afforded only to those arrangements that meet all of the specific conditions set forth in the safe harbor.  Defendants' conduct does not fall within any safe harbor.

38.     Compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), is a condition of payment under federal health care programs, and providers participating in the Medicare and Medicaid programs must agree to comply with the Anti-Kickback Statute and certify such compliance.

39.     By engaging in a kickback scheme to arrange for the provision of ambulance services reimbursed in whole or in part by the Medicare and Oklahoma Medicaid programs, Defendants have violated the Anti-Kickback Statute and thereby caused false claims to be submitted to the United States.

40.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended, the applicable civil penalties under the False Claims Act are $5,500 to $11,000 per false claim submitted to the United States on or after September 29, 1999.

**B.      The Medicare Program**

41.     In 1965, Congress enacted The Health Insurance Program for the Aged and Disabled through Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*.,

("Medicare"). Medicare is a federal health care program providing benefits to persons who are over the age of 65 and some under that age who are blind or disabled. Medicare is administered by CMS, a federal agency under HHS. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

42.     Medicare is a "Federal health care program," as defined in the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(f).

43.     The Medicare Program includes various "Parts," which refer to the type of service or item covered. For purposes of this action, the primary component of the Medicare Program is Part B, which authorizes payment of federal funds for certain medical and health services such as ambulance services, physician services, laboratory services, diagnostic services, and radiology services.

44.     Medicare pays for certain ambulance services to and from a hospital, critical access hospital, or skilled nursing facility. Medicare also pays for certain emergency ambulance transportation services.

45.     Medicare enters into agreements with providers and suppliers to establish their eligibility to participate in the Medicare Program. Providers and suppliers complete a Medicare Enrollment Application (often called a Form CMS-855) whereby the providers and suppliers must certify compliance with certain federal requirements, including specifically the Anti-Kickback Statute. The Medicare Enrollment Application also summarizes the False Claims Act in a separate section explaining the penalties for falsifying information in the application to "gain or maintain enrollment in the Medicare program."

46.     EMSA participated in Medicare as an ambulance supplier from at least 1998 to the present. EMSA has completed multiple Medicare Enrollment Applications. On various

occasions, EMSA and Williamson certified the following to the federal government under the

section entitled "CERTIFICATION STATEMENT":

> I agree to abide by the Medicare laws, regulations and program instructions that
> apply to this supplier[.]  The Medicare laws, regulations, and program instructions
> are available through the Medicare contractor.  **I understand that payment of a
> claim by Medicare is conditioned upon the claim and the underlying
> transaction complying with such laws, regulations, and program instructions
> (including, but not limited to, <u>the Federal anti-kickback statute</u> and the Stark
> Law), and on the supplier's compliance with all applicable conditions of
> participation in Medicare.**

(emphasis added).

47.     ETMC and Paramedics Plus have completed similar Medicare Enrollment

Applications and have certified the above language independently of EMSA's certifications.

48.     In addition, from at least 1998 through 2005, EMSA submitted paper claim forms

to Medicare, usually on a form referred to as a CMS-1500.  Each such claim form contained a

notice that the knowing filing of a claim containing false, incomplete, or misleading information

could subject the person to criminal prosecution and civil penalties.

49.     Each CMS-1500 also contains a version of the following certification statement

that EMSA, by submitting claims to Medicare, certified.  That statement states in part as follows:

> In submitting this claim for payment from federal funds, I certify that: 1) the
> information on this form is true, accurate and complete; 2) I have familiarized myself
> with all applicable laws, regulations, and program instructions, which are available
> from the Medicare contract; 3) I have provided or will provide sufficient information
> required to allow the government to make an informed eligibility and payment
> decision; 4) this claim, whether submitted by me or on my behalf by my designated
> billing company, complies with all applicable Medicare and/or Medicaid laws,
> regulations, and program instructions for payment including but not limited to **<u>the
> Federal anti-kickback statute</u>** and Physician Self-Referral law (commonly known as
> Stark Law) . . . .

(emphasis added).

13

50.     Beginning in approximately 2012, EMSA began submitting its claims to Medicare through an Electronic Data Interchange (EDI).  In order to participate in electronic claims submission, EMSA attested on the EDI enrollment application as follows:

> I understand that any individual who knowingly and willfully makes or causes to be made any false claim or false statement [or] false representation of a material fact in any application to the federal government for benefits or payment with respect to the Medicare program may be subject to civil and/or criminal enforcement action which may result in fines, penalties, damages and/or imprisonment.

## C.     The Medicaid Program

51.     The Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, administered in the State of Oklahoma as the Oklahoma Medicaid Program or "SoonerCare," ("Oklahoma Medicaid") is a health care benefit program jointly funded and administered by the State of Oklahoma and the United States.  CMS administers Medicaid on the federal level.  Medicaid helps pay for reasonable and necessary medical procedures and services provided to individuals who are deemed eligible under state low-income programs.

52.     Oklahoma Medicaid is a "Federal health care program," as defined in the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(f), in that it is a State health care program as defined in 42 U.S.C. § 1320a-7(h).

53.     The Oklahoma Health Care Authority (OHCA) is responsible for administering the Oklahoma Medicaid Program.  OHCA contracts with Oklahoma Medicaid providers, who must agree to comply with, among other things, federal Medicare laws, including the False Claims Act.

54.     The United States funds approximately fifty to sixty-five percent of each Oklahoma Medicaid payment made to Medicaid providers.  This federal share is known as the Federal Medical Assistance Percentage (FMAP).

55.     Oklahoma regulations, via the Oklahoma Administrative Code, set out that each Medicaid provider must enter into an approved provider agreement, which requires compliance with federal and state laws as a condition of payment.  Specifically, OHCA policy requires that "[i]n order to be eligible for payment, providers must have on file with OHCA, an approved Provider Agreement."  In entering into the provider agreement, an Oklahoma Medicaid provider specifically assures compliance with "all applicable Federal and State regulations."

56.     Over the years, EMSA completed multiple Medicaid Ambulance Service Provider Agreements with OHCA.   In fact, EMSA has been a contracted Ambulance Service Provider with OHCA since 1984 (Tulsa) and 1990 (Oklahoma City).  EMSA completed Renewal Agreements approximately every four years.  Williamson signed each renewal from at least 2002 through the present.

57.     From at least 2002 through the present, each renewal of EMSA's Oklahoma Medicaid provider agreement stated that EMSA "agrees to comply with all applicable Medicaid statutes, regulations, policies, and properly promulgated rules of OHCA."  The renewals further clarify that "[s]atisfaction of all claims will be from federal and state funds.  Any false claims, statements, or documents, or any concealment of a material fact may be prosecuted."

58.     Beginning with the 2008 renewal of its Oklahoma Medicaid provider agreement, EMSA also agreed it would "comply with and certify compliance with, *inter alia*, the Federal False Claims Act, 31 U.S.C. Sec. 3729-3733; 31 U.S.C.  Sec. 3801."

59.     Compliance with the Anti-Kickback Statute is a condition of payment for both Medicare and Medicaid.

## FACTS

**A.     Paramedics Plus "Wins" the EMSA Ambulance Contract**

60.     From 1994 through 1998, EMSA contracted with AMR.  During this period, EMSA began struggling financially, losing millions of dollars.  Williamson, who is one of the highest-paid public employees in Tulsa and Oklahoma City, needed EMSA to remain solvent to keep his job as well as his salary and benefits, which, for example, exceeded $240,000.00 in 2011.

61.     As a public middleman that does not actually provide ambulance or paramedic services, EMSA has had a longstanding competition with many of the local fire departments over the authority to provide these services for Tulsa and Oklahoma City residents.  The fire departments have sought to provide the services, while EMSA and Williamson prefer that their contractor provide those services.  If the fire departments obtained the authority to provide the ambulance services, EMSA would have no reason to exist, and, presumably, EMSA employees would lose their jobs.

62.     As EMSA's president, Williamson decided to use the only item of value that he and EMSA had to sell—the award of the EMSA ambulance services contract—to help relieve EMSA's financial distress and to help EMSA better compete for the authority to provide ambulance services.  Williamson met with Anthony Myers, an ETMC executive, at an industry conference in Florida, where the two discussed the following arrangement:  EMSA would award the contract to a new company formed and controlled by ETMC and, in return, the new, ETMC-controlled company would funnel portions of its proceeds back to EMSA.

63.     ETMC eventually called this new company "Paramedics Plus."  But Paramedics Plus did not exist as of November 1, 1997, when EMSA had opened up bidding for the ambulance services contract.  Paramedics Plus did not even exist when, on June 19, 1998, ETMC submitted a bid, on behalf of Paramedics Plus, for the EMSA contract.  Paramedics Plus did not file its Texas Articles of Organization until June 22, 1998. The initial managers for Paramedics Plus included Myers and Elmer Ellis, then the President and CEO of ETMC. [3]  Further, ETMC has guaranteed to Williamson, in writing, the financial condition of Paramedics Plus as well as backed Paramedics Plus's "operational performance" of the EMSA contract with the "full faith and credit of the ETMC System."

64.     In connection with its June 19, 1998 bid, ETMC and its officers secretly offered EMSA and Williamson kickbacks that the conspirators would later describe as a "profit cap."  ETMC and its officers secretly agreed with EMSA and Williamson that Paramedics Plus would pay back to EMSA any "excess" profits over 12% (on information and belief, 12% of gross revenues). [4]  The parties purposefully and intentionally did not reduce to writing this *quid pro quo* arrangement.

65.     At an EMSA Board of Trustees meeting on July 29, 1998, Williamson recommended the selection of Paramedics Plus.  The meeting minutes do not reflect any disclosure by Williamson or anyone else of the kickback arrangement to EMSA's Board.  That same day, EMSA awarded its Oklahoma ambulance services contract—worth more than $100

---

[3] Earlier in 1997, ETMC submitted bid information stating that it had joint-ventured with Rocky Mountain Holdings L.L.C to create a new jointly held subsidiary corporation named LifeNet South, Inc. that would provide the ambulance services.  Apparently, ETMC abandoned the LifeNet South entity when informed that a health care provider was already using a similar name.  ETMC touted its own ambulance services in Texas in an attempt to obtain the contract for both LifeNet South and Paramedics Plus.

[4] Years later, in response to EMSA's 2013 RFP, ETMC and Paramedics Plus admitted that, "[i]n 1997, we were the first in the industry to voluntarily propose a profit cap, a move no doubt seen as foolish by contractors accustomed to maximizing profit."

million—to Paramedics Plus, a company that at the time had no authority to conduct business in Oklahoma.

**B.     The Ambulance Services Contract between EMSA and Paramedics Plus**

66.     On October 26, 1998, EMSA and Paramedics Plus executed a contract awarding Paramedics Plus the exclusive right to provide ambulance services in EMSA's Oklahoma territory for a five-year period.  Notably, EMSA's RFP and the contract were silent as to any "rebate" payments, "profit cap" payments, or similar kickbacks.  The contract explicitly states that "[n]o prior agreement or understandings, verbal or otherwise of the parties, or their agents, shall be valid or enforceable unless embodied in the Contract, the RFP or the Proposal."

67.     On March 26, 2003, EMSA and Paramedics Plus modified the 1998 ambulance services contract.  The parties amended the payment schedule, which altered the rates payable by EMSA to Paramedics Plus.  In exchange, EMSA extended the contract five years, to October 31, 2008.  This modification also noted that EMSA "shall have the option to extend the term of the contract an additional five (5) years (*i.e.*, from November 1, 2008 through October 31, 2013)." The contract notably omitted any reference to the kickback arrangement or any "profit cap."

68.     After the first modification dated March 26, 2003, EMSA and Paramedics Plus amended the ambulance services contract four more times between 2008 and 2013.[5]  None of these modifications identified any kickback, bribe, "rebate," "gain sharing," or "profit splitting" provision, formula, or similar terms.  In fact, each of the modifications explicitly states that there were "no unwritten oral agreements between the parties."  This representation was false.

---

[5] The Second Modification, dated October 22, 2008, is discussed at length below.

**C.      The Kickbacks:  Cash, Gifts, Travel Stipends, and Political Contributions**

**(1)      Cash Payments**

69.      ETMC and Paramedics Plus went on to pay over $20 million in cash to EMSA,

Williamson, and other EMSA employees between 2006 and 2013.  These payments were

inducements to obtain and retain the multi-million-dollar EMSA ambulance contract, the award

of which Williamson influenced and directed.  ETMC and Paramedics Plus's own records show

the following payments, some of which went directly to EMSA and some of which went directly

to EMSA's contractors:

**PARAMEDICS PLUS**
**NET INCOME CAP REBATES**

| Check No. | Date | Amount | Vend ID | Vendor | Description |
|---|---|---|---|---|---|
| EMSA | | | | | |
| 20849 | 3/3/2006 | 638,198.00 | 22277 | EMERGENCY MED SVCX AUTHORITY | Batch 1 - 12/19 |
| 23014 | 8/22/2006 | 24,800.00 | 33428 | BRADSHAW CONSULTING SERVICES | |
| 23604 | 10/4/2006 | 700,000.00 | 9027790 | EMSA-KENT TORRENCE | Batch 1 - 12/19 |
| 25462 | 2/22/2007 | 297,200.00 | 9027790 | EMSA-KENT TORRENCE | Batch 1 - 12/19 |
| 25673 | 3/16/2007 | 102,198.00 | 9027790 | EMSA-KENT TORRENCE | Batch 1 - 12/19 |
| 29424 | 12/5/2007 | 1,035,500.00 | 9027790 | EMSA-KENT TORRENCE | |
| 30621 | 3/7/2008 | 500,000.00 | 36092 | EMSA | |
| 33809 | 10/30/2008 | 1,025,000.00 | 36092 | EMSA | |
| 34959 | 1/28/2009 | 1,303,250.00 | 36092 | EMSA | Batch 1 - 12/19 |
| 38656 | 9/15/2009 | 1,000,000.00 | 9027790 | EMSA-KENT TORRENCE | Batch 1 - 12/19 |
| 39954 | 12/4/2009 | 874,000.00 | 36092 | EMSA | Batch 1 - 12/19 |
| 42143 | 4/6/2010 | 300,000.00 | 36092 | EMSA | Batch 1 - 12/19 |
| 43740 | 7/2/2010 | 1,000,000.00 | 36092 | EMSA | Batch 1 - 12/19 |
| 46106 | 11/8/2010 | 5,738.00 | 9063773 | IN MOTION TECHNOLOGY | |
| 46106 | 11/8/2010 | 276,017.00 | 9063773 | IN MOTION TECHNOLOGY | |
| 46531 | 12/7/2010 | 17,640.00 | 9063773 | IN MOTION TECHNOLOGY | |
| WIRE | 12/6/2010 | 2,906,995.00 | | EMSA | Batch 1 - 12/19 |
| 47123 | 1/4/2011 | 25,000.00 | 36092 | EMSA | Batch 1 - 12/19 |
| 48310 | 3/4/2011 | 400,000.00 | 36092 | EMSA | Batch 1 - 12/19 |
| WIRE | 7/18/2011 | 2,000,000.00 | | EMSA | Batch 1 - 12/19 |
| 52889 | 10/6/2011 | 1,500,000.00 | MPMP719 | EMSA | Batch 1 - 12/19 |
| 53379 | 10/26/2011 | 37,035.00 | MPMP772 | CONNELLY PAVING CO. | |
| 53245 | 10/20/2011 | 366,691.17 | MCO1321 | ZOLL DATA SYSTEMS | Batch 1 - 12/19 |
| WIRE | 11/21/2011 | 1,210,633.83 | | EMSA | Batch 1 - 12/19 |
| 55001 | 1/4/2012 | 11,440.00 | MPMP730 | CCASLIN CONSTRUCTION | |
| 55001 | 1/4/2012 | 142.85 | MPMP730 | CCASLIN CONSTRUCTION | |
| 55001 | 1/4/2012 | 2,840.14 | MPMP730 | CCASLIN CONSTRUCTION | |
| 60207 | 7/27/2012 | 2,000,000.00 | MPMP719 | EMSA | |
| 65033 | 1/24/2013 | 1,089,077.00 | MPMP719 | EMSA | |
| | | 20,649,395.99 | | | |

70.      Although ETMC, Paramedics Plus, Myers, EMSA, and Williamson agreed that

payments would be made, they never reduced to writing (except, as explained below, when

deceiving a state auditor) the terms as to how to calculate the payments, when to pay the

kickbacks, who would pay taxes on the kickbacks, and so forth.  Instead, ETMC and Paramedics Plus paid kickbacks to EMSA and Williamson on a haphazard schedule.  The kickbacks were rarely paid the same month of the year, often taking the form of "advances" or "interest-free" loans to EMSA paid at Williamson's request.

71.     Further, although Defendants later contended that the "profit cap" was to be triggered after Paramedics Plus hit a certain percentage of profit (on information and belief, a percentage of Paramedics Plus's gross revenue), the kickbacks were often for large, rounded amounts.  Paramedics Plus employees usually submitted check requests to ETMC on ETMC System check requisition forms, and ETMC employees would then authorize the payments.  For example, ETMC and Paramedics Plus issued checks to EMSA in the following amounts, all of which were suspiciously round numbers for a purported arms-length "rebate" based on a percentage of gross revenues:

| | |
|---|---|
| October 4, 2006: | $700,000.00 |
| December 5, 2007: | $1,035,500.00 |
| March 7, 2008: | $500,000.00 |
| October 30, 2008: | $1,025,000.00 |
| September 15, 2009: | $1,000,000.00 |
| April 6, 2010: | $300,000.00 |
| July 2, 2010: | $1,000,000.00 |
| January 4, 2011: | $25,000.00 |
| March 4, 2011: | $400,000.00 |
| July 18, 2011: | $2,000,000.00 |
| October 6, 2011: | $1,500,000.00 |
| July 27, 2012: | $2,000,000.00 |

72.     The checks issued by ETMC and Paramedics Plus to their source of business show no honest effort to calculate "profit cap" payments according to a fixed formula or schedule.  As explained below, many of these payments were made as inducements leading up to major contracting events (such as the 2008 renewal) or as gratuities for favorable steps taken by EMSA and Williamson.

73.     Importantly, these cash payments were made to EMSA from a variety of ETMC and Paramedics Plus accounts.  For instance, internal Paramedics Plus documents show that Paramedics Plus reimbursed ETMC Tyler Hospital $2,906,995.00 on December 6, 2010 for the "wire made to EMSA."   Further, ETMC System directly wired $2,000,000.00 to EMSA on July 18, 2011 and another $1,210,633.83 on November 21, 2011.

74.     In addition, ETMC and Paramedics Plus often paid EMSA's bills directly or simply bought expensive items and services for EMSA.  For example, ETMC and Paramedics Plus paid for certain construction, paving, data systems, consulting, marketing, and technology services provided to EMSA.  Many of these services or systems had value that outlasted the EMSA and Paramedics Plus contract, and, upon information and belief, some of the items and systems are still used by EMSA today.

75.     By having Paramedics Plus directly pay contractors such as Connelly Paving Co., In Motion Technology, and Zoll Data Systems, EMSA circumvented its own public bidding obligations.  Specifically, effective as early as 2007, EMSA was required by written policy to place all expenditures exceeding $25,000.00 out for public bid.  Williamson simply used ETMC and Paramedics Plus like a line of credit, bypassing the EMSA Board's required approval of certain large expenditures.  Paramedics Plus voluntarily paid EMSA's contractors hundreds of thousands of dollars to keep Williamson satisfied and to therefore maintain the ambulance services contract.  These payments were not itemized in EMSA's audited financial records.

76.     ETMC and Paramedics Plus also made direct payments to EMSA's marketer, Mike Duncan, for marketing services provided to EMSA.[6]

---

[6] Paying for a referral source's marketing is addressed extensively in compliance guidance and case law as illegal remuneration that cannot be offered in exchange for referrals or Medicare business.

(2)      **Gifts**

77.      ETMC and Paramedics Plus paid at least $50,000.00 for Williamson's travel

expenses as president of a different organization, the American Ambulance Association.  Not

only was this travel unrelated to the contract between the parties, but Williamson separately

received a stipend of approximately $1,000.00 per month from the Association for his travel as

its president.  At least one of these travel payments appears to have been made as an inducement

to Williamson to obtain and keep the ambulance services contract:  on October 30, 2008, *the*

*same day* Williamson signed a five-year extension with Paramedics Plus, ETMC and Paramedics

Plus paid EMSA $25,000.00 for Williamson's American Ambulance Association "travel."

78.      Defendants now claim that the kickback scheme was a "rebate" arrangement

whereby the money flowed back to the Tulsa and Oklahoma City communities.  However,

ETMC and Paramedics Plus "booked" the $25,000.00 "travel" payment "against the rebate,"

which means Williamson personally benefitted from money Defendants claim was owed to

EMSA to benefit local communities.  Importantly, although certain arrangements are exempted

from the Anti-Kickback Statute or are protected under regulations interpreting the statute,

Defendants' assertions, even if true, do not meet the definition of an exempted or protected

discount.  For example, the terms of Defendants' profit-splitting scheme and the terms governing

the payments were never fixed or disclosed in writing.

79.      Thereafter, on January 4, 2011, ETMC and Paramedics Plus paid EMSA *another*

$25,000.00 for Williamson's American Ambulance Association travel.  Neither of the two

$25,000.00 payments for Williamson's travel was disclosed to EMSA's Board of Trustees.

Upon information and belief, there were more payments made for Williamson's benefit that were

not disclosed to the Board, the public, or the Medicare and Oklahoma Medicaid programs.

80.     In addition to the $50,000.00 for Williamson's travel, Williamson and other EMSA employees received gifts.  In December 2010, ETMC and Paramedics Plus bought Williamson steaks valued at $1,334.70.  These gifts were not disclosed to the EMSA Board, the public, or the Medicare and Oklahoma Medicaid programs.

81.     In a December 8, 2010 email exchange between Stephen Dean, the then-Chief Operating Officer for Paramedics Plus in Oklahoma, and Joanne McNeil, another Paramedics Plus employee, Mr. Dean notes that he is ordering steaks for Williamson and says other steaks needed to be ordered for Dr. John Sacra, EMSA's prior Medical Director, and Dr. Jeff Goodloe, EMSA's then-current Medical Director.  Mr. Dean noted that Dr. Sacra needed steaks "because we may need his help before the next year is over."

82.     ETMC and Paramedics Plus paid for these gifts to high-ranking EMSA executives and employees.  The gifts were incentives to a source of business intended as *quid pro quo* payments.

83.     In addition, Williamson frequently paid for spa visits or parties for EMSA employees and "charged" them to ETMC and Paramedics Plus.  ETMC and Paramedics Plus paid the charges without hesitation.

84.     On January 25, 2013, Paramedics Plus employee Joanne McNeil informed Tony Farmer, an executive at ETMC and Paramedics Plus, that Paramedics Plus did in fact pay for spa visits at Mr. Williamson's request "because Steve simply charged it back to us on the misc invoice and the COOs never questioned because we knew it would go against the final rebate."

85.     In the fall of 2011, Williamson promised to make a contribution towards a birthday party for an American Ambulance Association representative named "Maria."[7]  On

---

[7] Upon information and belief, "Maria" was Maria Bianchi, the then-Executive Vice President of the American Ambulance Association.

October 3, 2011, Katie McNealy at the American Ambulance Association emailed Williamson a $1,000.00 invoice for his contribution.  That same day, Williamson forwarded the invoice to an EMSA accounting manager named Mike Albright stating, "Mike please pay soon and charge P+."

86.     These gifts were unlawful kickbacks and bribes designed to induce Williamson and EMSA to contract with ETMC and Paramedics Plus.  The gifts were not disclosed on EMSA's audited financial records.

### (3)     Political Contributions

87.     At EMSA and Williamson's behest, ETMC and Paramedics Plus also made political contributions to Oklahoma politicians, including city councilmen and mayoral candidates who determined whether EMSA continued as the public ambulance services middleman in Tulsa and Oklahoma City.  For instance, Kim Holland, a politician running for Insurance Commissioner in 2010, emailed Williamson on September 27, 2010 asking for a $2,000.00 donation from "the ParaMedics Plus PAC" (*i.e.*, political action committee).  Williamson exercised so much control over Paramedics Plus that politicians went through him for contributions and some apparently believed Paramedics Plus was a political action committee.  As for Ms. Holland's request for $2,000.00, Williamson forwarded that request to Paramedics Plus, which then made a $2,000.00 donation to her campaign.

88.     On occasion, Williamson asked that political contribution checks be issued by ETMC and Paramedics Plus and sent directly to EMSA.  Williamson or other EMSA employees would then physically present the check to the preferred candidate.

89.     For instance, on January 12, 2010, ETMC and Paramedics Plus issued a check for $1,000.00 payable to Dewey Bartlett's campaign for mayor of Tulsa.  The ETMC System check

24

requisition form explicitly notes that the request was from "President of EMSA Steve

Williamson" as shown below:



90.     Notably, internal ETMC and Paramedics Plus documents establish that this

contribution "will go against the rebate."  As a public entity, EMSA could not legally make

political contributions.  The political contributions made by ETMC and Paramedics Plus at

Williamson's behest were yet another form of kickbacks paid to benefit Williamson and

EMSA—Paramedics Plus's contract source.

91.     In January 2011 and April 2011, Mayor Dewey Bartlett issued two executive

orders, 2011-02 and 2011-03.  The executive orders prohibited employees of the Tulsa Fire

Department—EMSA's most vocal competitor in Tulsa—from taking part in local political

campaigns or using their positions to influence the outcomes of local political campaigns.

92.     Meanwhile, Defendants poured donations into the campaign coffers of local

politicians, including another $1,000.00 donation to Mayor Bartlett on June 2, 2011, soon after

he issued the above executive orders.  Other examples of contributions requested by Williamson

and paid by ETMC and Paramedics Plus included multiple $1,000.00 checks to Charlie Swinton

for Oklahoma City Council.  In January 2011, ETMC and Paramedics Plus sent Williamson

another $1,000.00 check, which was accompanied by emails with the subject, "$1000 for

Republican party to give to Steve."  A similar check request was made to ETMC by EMSA's

Ann Laur for the "Senate Republican Caucus."

93.     On August 12, 2011, the legislative assistant for two Oklahoma state

representatives sent Williamson a $1,500.00 invoice for "the AC Hamlin Banquet."  Williamson

forwarded the invoice to Stephen Dean at Paramedics Plus asking him to "rush this through and

send it in."

94.     EMSA received a direct benefit from the political contributions made by ETMC

and Paramedics Plus, as established in a January 17, 2011 email from EMSA's Public

Information Officer, Lara O'Leary, to Paramedics Plus's Stephen Dean, which reads as follows:

> Stephen, [a] man named Ed Shadid is running against Sam Bowman for the ward 2
> city council spot in March.  I would like for P+ to contribute to his campaign.  I'll be
> going to his campaign speech on the 25th.  He wants to meet with me to talk about
> EMSA.  I am available for that and would like to be able to offer a donation.  Can we
> talk Tuesday about the best way to handle this. [sic]
>
> Incumbent [sic] Sam Bowman has been somewhat of a thorn for us for some time… .
> [sic] as he talks of Fire's wonderful ways.  He has voted against us in the past.

95.     ETMC and Paramedics Plus contributed $1,000.00 to Bowman's opponent and

former EMSA Board of Trustees member Ed Shadid.  Mr. Shadid ripped up the check, and, on

September 15, 2011, Mr. Shadid forwarded specific questions to EMSA's Lara O'Leary and

Williamson.  Mr. Shadid asked, "Which members of the OKC City Council have received

campaign contributions from EMSA and/or Paramedics Plus[?] What is the amount of those

donations?"  After an internal back-and-forth massaging the language of the response,

Williamson answered:

> EMSA does not make contributions to political campaigns, including city
> council campaigns.  EMSA does not possess information that would allow
> it to respond on behalf of Paramedics Plus with regard to its business

> activities nor has EMSA researched the individual contribution reports of any of the current or past city council candidates.

Williamson's response was untrue and purposefully evasive to hide the illegal and unsavory reality that ETMC and Paramedics Plus functioned as his all-purpose slush fund. Williamson did in fact have information that would allow him to respond because he had personally asked for political donations from ETMC and Paramedics Plus and delivered some of the contribution checks to local politicians. Williamson knew the conduct was unlawful and deliberately concealed it.

96. These contributions were unlawful remuneration designed to induce Williamson and EMSA to contract with ETMC and Paramedics Plus and provide them the opportunity to access Medicare and Oklahoma Medicaid funds. The contributions were not disclosed on EMSA's audited financial records.

**(4)  In Order to Ensure Sufficient Kickbacks, Myers and Paramedics Plus Cut Corners**

97. Myers and Paramedics Plus cut corners on services to the taxpayers as a result of the kickback promises. In fact, Myers avoided training and personnel expenses to ensure EMSA and Williamson received specific kickback payments. Some of the expenses Myers avoided would have improved Paramedics Plus's performance and quality of care.

98. For instance, in 2009, Paramedics Plus executives in Oklahoma recommended the payment of retention bonuses for field personnel such as paramedics and drivers. Paramedics Plus had ample profit available to make these payments and no written agreement with EMSA prohibited the payment of such expenses. Paramedics Plus had previously suffered problems with employee retention, including, in particular, a high paramedic turnover rate.

99.     Myers refused to pay the bonuses and expressed concerns to other executives that he "would not have enough excess profits to make [Williamson] whole."  Executives in Oklahoma argued for the bonuses, concerned that the loss of paramedics would negatively affect Paramedics Plus's performance in Oklahoma.  Myers refused, and the money was used to pay kickbacks to EMSA, Paramedics Plus's primary source of revenue.

100.     Similarly, in September 2010, internal correspondence shows that Myers halted spending on most items, including scheduler training, until the new budget year because he promised Williamson a kickback of $4.8 million and it was only at $4.6 million.  In other words, Myers manipulated costs to satisfy side agreements he made with Williamson.

101.     In approximately 2012, Paramedics Plus hired an independent consultant to provide advice on its operations.  The consultant found that the kickback payments were affecting Paramedics Plus's "fiscal judgment."  The consultant specifically found that the money could be used to "help Paramedics Plus solve a few current issues, rather than pay for the extras that EMSA wishes[.]"  Paramedics Plus ignored that advice.

102.     Meanwhile, ETMC and Paramedics Plus booked the kickbacks as, among other things, "public relations" expenses. The money used for the kickbacks remained in the control of ETMC and Paramedics Plus, and Myers and other executives determined that the money should be used to pay EMSA and Williamson to obtain and retain the contract, rather than to train schedulers or retain paramedics.

**D.     ETMC and Paramedics Plus Purchase a Five-Year Extension Through Bribes**

103.     The EMSA contract was always Paramedics Plus's largest and most lucrative contract.  Beginning in 2006, Paramedics Plus's annual revenues under the EMSA contract began to climb substantially.  From 2006 through 2013, Paramedics Plus's revenues under the

EMSA contract steadily climbed from approximately $30 million in 2006 to over $56 million in 2013.  Along with rising revenues, ETMC and Paramedics Plus's profits also climbed over this time period.

104.    With rising profits, ETMC and Paramedics Plus showed more and more appreciation for EMSA's business through more and more kickback payments.  The kickback payments climbed from approximately $1.3 million in 2006 to approximately $5.5 million in 2011.  According to Defendants' own documents, the kickback payments by year from 2006 through 2013 were as follows:



105.    In effect, ETMC and Paramedics Plus were not "sharing" a small portion of their profits; in fact, the amount of kickbacks paid to EMSA often exceeded 40% of Paramedics Plus's total profits on the contract—at least until, as explained below, ETMC and Paramedics Plus learned in late 2012 or early 2013 that Paramedics Plus was losing the EMSA contract.

106.    The contract between EMSA and Paramedics Plus was set to expire in October 2008.  EMSA controlled the award of a five-year extension through 2013.

107.    In 2007, Paramedics Plus hired a new chief operating officer for the EMSA contract named Glenn Leland ("Leland").  Leland had a prior relationship with Williamson, and

ETMC and Paramedics Plus leadership believed Leland would help maintain the relationship with Williamson and EMSA.

108.    Leland had been employed in the ambulance industry since 1975.  When hired by Paramedics Plus in 2007, Paramedics Plus executives described the "profit cap" arrangement to him.  Leland was surprised because he had never seen such an arrangement and questioned whether it was legal.  Around that same time, Leland approached both Myers and Williamson and asked whether the arrangement was appropriate.  Both Myers and Williamson falsely told Leland that it had been vetted and was fine.

109.    In 2007, EMSA had a new RFP prepared to place the ambulance contract out for bid.  To stop the bid from being issued, Paramedics Plus employees met in secret with Williamson and offered, among other things, to lower the rates charged under the contract and to lower the "profit cap" percentage from 12% to 10.5%, ensuring higher kickbacks to EMSA.

110.    In particular, in September or October 2007, Paramedics Plus presented a "Confidential" presentation to Williamson entitled "EMSA Operating Economics Presentation." The written proposal in the PowerPoint explicitly stated that Paramedics Plus was proposing to "modify 2008 rates to improve EMSA cash flows and operating results *in exchange for* sole source negotiation of contract extension on identical terms and operating standards."  (Emphasis added).  Paramedics Plus proceeded to present a menu of "Pricing Options" that included various "profit cap" percentages and cash payment options that EMSA could choose from to benefit EMSA and Williamson.  Notably absent from the presentation were quality of care metrics, such as response times and performance statistics.

111.    Paramedics Plus officer Glenn Leland took notes regarding this meeting.  His notes state that the reduced profit cap and reduced pricing was "an incentive" for the contract

extension because it "was not certain."  Williamson and EMSA ultimately accepted better terms, including a reduced "profit cap" that would result in more cash payments to EMSA.

112.    At an EMSA Board meeting on October 24, 2007, Williamson informed the Board that the RFP was prepared and had been sent to the Board members.  Williamson informed the Board that he was negotiating a possible five-year extension with Paramedics Plus.

113.    On November 28, 2007, Williamson made a presentation to the EMSA Board of Trustees regarding the renewal of the Paramedics Plus contract.  Williamson's presentation highlighted Paramedics Plus's "clinically excellent service," response times, intubation success, survival rates, and obliquely mentioned "cost savings."  The meeting minutes are silent as to any mention of a "profit cap," higher kickbacks, more "rebates," or any similar arrangement. Williamson recommended the extension of the contract, and the Board approved the extension. **Within a week**, ETMC and Paramedics Plus paid EMSA and Williamson $1,035,500.00.  ETMC and Paramedics Plus claim they cannot locate a copy of this check or any bank records or correspondence concerning this payment.

114.    Based on Paramedics Plus's own documents, Paramedics Plus and EMSA *immediately* instituted the lower 10.5% profit splitting arrangement in November 2007, even though the existing contract ran through October 2008.  In other words, ETMC and Paramedics Plus, with no legal obligation, began paying higher kickbacks to EMSA in appreciation for a contract extension that would go into effect *a year later*.  Defendants again failed to memorialize any of these terms in a written agreement.

115.    Having received the approval of the Board to negotiate an extension with Paramedics Plus, Williamson exploited the situation, resulting in more bribes from ETMC and Paramedics Plus.  On March 12, 2008, Myers sent Williamson a check payable to EMSA in the

31

amount of $500,000.00 as an "advance against the excess profits" anticipated for the year.

Myers explained that, if "we do not have excess profits exceeding this amount, the amount of the

advance greater than the excess profit will revert to an interest free loan."[8]  However, as noted

above, Myers manipulated costs to ensure robust kickback payments and made no effort to seek

repayment of this money.  In addition, the calculation of "excess profits" could not be questioned

or scrutinized as it was nowhere in any written agreement between the parties.

116.     On October 28, 2008, Williamson signed the Second Modification to the EMSA

ambulance services contract.  Even though Paramedics Plus had not yet signed the modification,

ETMC and Paramedics Plus issued two checks payable to EMSA on ***the exact same day***

Williamson signed—the same day Williamson ensured Paramedics Plus five more years of

multi-million-dollar revenues.   The first check was for $1,000,000.00 as a "prepayment" of

"rebates" for the 2008 to 2009 contract year that had not yet started.  The second check (again,

cut the same day Williamson executed the extension) was for $25,000.00 for Williamson's

"travel."

117.     Myers signed the Second Modification on October 31, 2008.  The EMSA contract

remained silent about any of these advances, kickbacks, bribes, "rebates," or "profit sharing."

118.     The 2007 EMSA RFP was never issued for public bid, and companies such as

AMR did not have an opportunity to compete for the contract.

119.     A draft of the 2007 EMSA RFP dated September 30, 2007, while never issued to

the public, was exchanged back and forth between EMSA and Paramedics Plus employees.

Remarkably, Page 53 of the draft RFP made the following an event of default:

> Payment by the contractor or any of the contractor's employees of any bribe, kickback or
> consideration of any kind to any federal, state, or local public official or consultant in

---

[8] Interest-free loans are addressed extensively in compliance guidance and case law as illegal remuneration that
cannot be offered to a referral source in exchange for referrals or Medicare and Medicaid business.

exchange for any consideration whatsoever, when such consideration could reasonably be construed to be a violation of any federal, state or local law.

This, of course, was exactly what ETMC and Paramedics Plus were doing.

120.     Around this time, Leland told Myers that the extension of the EMSA contract would be a good opportunity to put the "profit cap" arrangement in writing.  Myers preferred for the arrangement to remain unwritten.  Myers signed the Second Modification on October 31, 2008, which remained silent about any advances, kickbacks, bribes, "rebates," or "profit sharing."

121.     EMSA did not book the kickback payments in its accounting records.  Instead, EMSA subtracted the amount of the payments made from the amount it paid Paramedics Plus, which EMSA then booked to show "cost savings."  In other words, if EMSA paid Paramedics Plus $50 million one year but was paid kickbacks of $5 million, EMSA would simply and deceptively show payments to Paramedics Plus of $45 million.

122.     Importantly, Paramedics Plus's own documents purporting to track profit percentage do not equal the amount of kickbacks paid.  Moreover, Paramedics Plus's own internal correspondence shows an estimated 2011 or 2012 kickback of less than $1 million; however, Paramedics Plus paid EMSA over $5 million in 2011 and approximately $2 million in 2012.

## E.     Defendants Knowingly and Willfully Broke the Law

### (1)     Defendants Ignored the Law and Their Own Compliance Training

123.     The False Claims Act, originally enacted in 1863 and substantially amended in 1986, is a well-known statute in the health care industry.  Defendants had knowledge of the False Claims Act and its prohibitions prior to the 1997 bid on the EMSA contract.

124.    The Anti-Kickback Statute, originally enacted in 1972, is also a well-known statute in the health care industry.  Defendants had knowledge of the Anti-Kickback Statute and its prohibitions prior to the 1997 bid on the EMSA contract.

125.    Defendants also had knowledge of compliance guidance in the health care industry related to the False Claims Act and the Anti-Kickback Statute, including guidance issued by HHS-OIG.

126.    In March 2003, HHS-OIG provided specific guidance to ambulance suppliers as to prohibited practices under the Anti-Kickback Statute.  Published in the Federal Register, Vol. 68 FR 14245, No. 56, on Monday, March 24, 2003, HHS-OIG explained:

> An ambulance supplier should not offer or provide gifts, free items or services, or other incentives of greater than nominal value to referral sources, including patients, and should not accept such gifts and benefits from parties soliciting referrals from the ambulance supplier.  In general, token gifts used on an occasional basis to demonstrate good will or appreciation (*e.g.*, logo key chains, mugs, or pens) will be considered to be nominal in value.

The guidance continues:

> Ambulance suppliers should review the following arrangements with particular care. . . .  Contracts with cities or other EMS sponsors for the provision of emergency medical services may raise anti-kickback concerns.  Ambulance suppliers should not offer anything of value to cities or other EMS sponsors in order to secure an EMS contract.

127.    This compliance guidance was published in 2003, long before ETMC and Paramedics Plus paid for the EMSA contract extension in 2008.  Moreover, Defendants were aware of the guidance.  In particular, Williamson served as President of the American Ambulance Association, whose "Compliance Manual" copies verbatim from the 2003 HHS-OIG guidance above.

128.    Defendants were directly or indirectly involved with the American Ambulance Association, which published a Compliance Manual and conducted compliance training on the

False Claims Act and the Anti-Kickback Statute continuously since the mid-1980s.  Defendants and/or their employees attended compliance training with the American Ambulance Association.

129.    Defendants had compliance policies in place pertaining specifically to the False Claims Act and the Anti-Kickback Statute.  Defendants' kickback conduct violated those policies.

130.    In or around 2008, Williamson became the Compliance Officer for all of EMSA.[9] EMSA had policies prohibiting conflicts of interest as well as the acceptance of "any bribe, kickback or consideration of any kind in exchange for any consideration whatsoever."  EMSA's own "Principle 6" states that EMSA employees "do not accept gifts or favors from outside vendors without supervisory approval" and claims that all "[r]elationships with contractors are at arm's length."

131.    EMSA also had a "Fraud and Abuse Compliance Program," which described the False Claims Act in detail.  EMSA's Fraud and Abuse Compliance Program has a stand-alone section entitled "Payments for Referrals and Related Fraud and Abuse Issues," which mentions "prohibitions against payments for referrals, ***kickbacks and <u>rebates</u>***, and other illegal inducements[.]" (emphasis added).  In March 2008, the EMSA Board was presented with a PowerPoint presentation on EMSA's "Fraud and Abuse Compliance Program," which highlighted the following three types of fraud and abuse:  False Claims; "Kickbacks or other payments in exchange for referrals"; and Self-Referrals.

132.    Further, on multiple occasions, Williamson submitted affidavits to the Oklahoma Health Care Authority (OHCA) supporting EMSA's applications to renew its Oklahoma Medicaid participation.  Those affidavits state that neither EMSA nor anyone subject to EMSA's

___
[9] Williamson's dual role as CEO and Compliance Officer created an obvious conflict in responsibilities and seriously undermined the effectiveness of EMSA's compliance program.

control "has paid, given, or donated or agreed to pay, give or donate to any officer or employee of the State of Oklahoma any money or other thing of value either directly or indirectly, in procuring the contract[.]"  Williamson recognized that public officials should not receive anything of value in connection with the award of public contracts.

133.     Williamson—EMSA's Compliance Officer—ignored EMSA's policies and solicited and accepted remuneration from ETMC and Paramedics Plus.  EMSA now claims the cash payments from ETMC and Paramedics Plus were "rebates," which are also ***explicitly prohibited*** by EMSA's own Fraud and Abuse Compliance Program.

134.     Upon information and belief, both ETMC and Paramedics Plus have similar policies prohibiting the payment of bribes or kickbacks to referral sources—policies that reference the Anti-Kickback Statute and the False Claims Act.  Upon information and belief, ETMC and Paramedics Plus violated their own policies through the payment of the kickbacks enumerated herein.

### (2)     Defendants Circumvented EMSA's Public Bidding Obligations

135.     EMSA also violated its own purchasing and bidding requirements.  Specifically, effective as early as 2007, EMSA was required by written policy to place all expenditures exceeding $25,000.00 out for public bid.  Similar to the ambulance RFP process, EMSA—a public entity—had an obligation to undertake an "open market procedure," which helps prevent conflicts of interest and allows the public to monitor EMSA's purchases.

136.     Williamson was aware of this public bidding requirement.  However, hundreds of thousands of dollars in expenditures benefitting EMSA were made directly by ETMC and Paramedics Plus, thereby circumventing EMSA's public bidding process.  As examples, Paramedics Plus made the following payments on EMSA's behalf and counted them towards the

yearly kickback totals:  $37,500.00 to Connelly Paving Co., $276,017.00 to In Motion

Technology, and $366,691.17 to Zoll Data Systems.

> **(3)     Defendants Deceived the Oklahoma State Auditor and Inspector**

137.     Beginning in 2011, media reports called into question expenditures made by

Williamson and EMSA, as well as potential conflicts of interest between EMSA and Paramedics

Plus.

138.     In response, EMSA's Board requested that the Oklahoma State Auditor and

Inspector perform a special audit into EMSA's relationship and business dealings with

Paramedics Plus.  The Oklahoma State Auditor and Inspector investigated specific allegations,

including:  (1) that Williamson's daughter was employed by EMSA's primary collection firm;

(2) that Williamson's American Ambulance Association costs were partially subsidized by

EMSA without Board approval; and (3) that Paramedics Plus had "sponsored" a portion of

Williamson's American Ambulance Association travel costs.  The state auditor was not charged

with looking into potential violations of federal law, including the Anti-Kickback Statute.

139.     The media reports did not identify the unwritten, "pay to play" scheme whereby

ETMC and Paramedics Plus paid kickbacks in exchange for the EMSA contract.  However,

Defendants anticipated that this illegal arrangement would be discovered and took steps to make

it appear legitimate.

140.     On September 11, 2012, the Oklahoma State Auditor and Inspector visited EMSA

for a preliminary meeting.  Williamson and other EMSA employees knew that the auditor would

likely find out about the extent of the kickback arrangement.  Accordingly, Williamson asked

EMSA's law firm, Riggs, Abney, Neal, Turpen, Orbison & Lewis, to prepare a ghostwritten

letter on behalf of Paramedics Plus's President, Ron Schwartz.  EMSA employees sent emails

late into the evening on September 11, 2012—the same day the auditor met with EMSA

personnel for a preliminary meeting.  In those emails, EMSA employees asked if "the letter" was

ready and stated that "Steve really wants to have it in hand" before the audit began.

141.    "The letter" came the next day, and EMSA employees printed it on Paramedics

Plus letterhead.  EMSA employees added "the letter" to the file and included it in the "full"

contract file.  "The letter" was a document purporting to be from Ron Schwartz to Williamson

confirming the existence of a profit cap arrangement.

142.    The fraudulent letter was purposefully undated and contained false information.

For instance, the letter stated that the lowered profit cap (*i.e.*, increased kickbacks) did not begin

until April 28, 2010—at least 2.5 years after the parties instituted the higher kickback

arrangement.  Internal email correspondence establishes Defendants knew the lowered cap went

into effect immediately after the EMSA Board voted to extend Paramedics Plus's contract in the

fall of 2007.  The fraudulent letter also purported to "confirm" terms of an existing agreement,

including how the payments were to be calculated, when the payments would be made, and

under what conditions—an attempt to make Defendants' ongoing conduct appear legitimate.

The letter claimed there was an annual audit used to calculate the payments, which was not true.

143.    Ron Schwartz purportedly signed this letter, and it was placed in the contract file

prior to the auditor's arrival.  EMSA inserted the fraudulent letter just after the document

reflecting the April 28, 2010 modification of the EMSA contract, but just in front of the

incorporated 52-page 2007 RFP.  Defendants papered the file to make it appear this letter had

existed for years.  Defendants knew the arrangement was illegal and believed a written letter of

some sort—even if there was only the appearance of a written agreement—would prevent

detection of the illegal kickback scheme.

144.     The Special Audit focused on the period between January 1, 2009 and June 30, 2012, and highlighted the EMSA Board's inadequate supervision of Williamson, which "fostered a culture of acquiescence in which officers and employees are permitted to establish inappropriate patterns of expenditure behavior and fail to disclose potential conflicts of interest, unbeknownst to members of the Board."

**(4)     Paramedics Plus Loses the EMSA Business and Stops Paying Kickbacks**

145.     In 2012, EMSA and Williamson began preparing a new RFP as Paramedics Plus's contract was coming to an end.  In this new RFP, EMSA required its bidders to offer "gain sharing" arrangements, which was another euphemism for kickbacks.  This was the first instance of the scheme being mentioned in an EMSA RFP.

146.      In late 2012, EMSA issued the RFP, and ambulance companies submitted their bids in or around May 2013.  Internal email correspondence dated June 24, 2013 between Williamson and EMSA's Chief Financial Officer Kent Torrence shows that Mr. Torrence projected Paramedics Plus's potential 2014 kickback payment if Paramedics Plus were to win the new contract.  Mr. Torrence stated that the payment might end up lower than he had hoped.  This projection shows the importance EMSA placed on the amount of cash kickbacks it would receive from its contractor in deciding how to award the contract.

147.     On July 24, 2013, EMSA's Board voted to award the EMSA contract back to AMR, which offered significant cost savings over Paramedics Plus's bid.  AMR offered to perform the services for approximately $44 million less than Paramedics Plus's bid.  In other words, although Paramedics Plus claims it gave money back to the public through its unwritten "profit cap" scheme, its anti-competitive behavior likely cost taxpayers tens of millions of dollars

from 2008 through 2013 alone because AMR and other companies never had a chance to bid in 2008.

148.    In early to mid-2013, after ETMC and Paramedics Plus learned that EMSA would award the contract to AMR, ETMC and Paramedics Plus abruptly stopped paying the kickbacks because there was no longer anything to receive in return.  Internal Paramedics Plus documents show its employees stopped making any effort to track the so-called "cap" payments.

**F.      The United States Suffered Damages as a Result of Defendants' Illegal Actions**

149.    As a condition of payment, Medicare and Medicaid providers and suppliers must certify compliance with the Anti-Kickback Statute and must not solicit, accept, offer, or pay anything of value in exchange for referrals or the arrangement of services, any part of which is paid for by federal taxpayer dollars.  The United States relied upon Defendants' certified compliance with federal health care laws, including the certifications of compliance submitted or caused to be submitted to HHS and OHCA.

150.    Defendants' express false certifications are material.  For decades, compliance with the Anti-Kickback Statute has been material to the United States' decision to pay Medicare and Medicaid claims.  The United States has continuously brought suit and pronounced publicly that it will not use taxpayer money to reimburse services arranged for through the use of unlawful inducements.  HHS has continuously and publicly excluded from participation in Medicare providers and suppliers caught violating the Anti-Kickback Statute.

151.    Defendants knew that compliance with the Anti-Kickback Statute was a condition of payment and a material requirement for receiving Medicare and Medicaid reimbursement, which is the primary reason Defendants concealed their illegal arrangement.

152.     HHS was unaware of Defendants' conduct until the United States investigated the allegations brought by Relator Stephen Dean.  Mr. Dean filed this action in 2014.  Paramedics Plus had already lost the EMSA contract at that point.  Had HHS learned of Defendants' illegal conduct during the time Paramedics Plus was performing ambulance services for EMSA, HHS would have ceased making payments to EMSA.

153.     Defendants never sought guidance or permission from the United States to engage in the actions detailed above.  Instead, Defendants concealed their illegal activities while continuously billing Medicare and Oklahoma Medicaid.

154.     Over the course of Defendants' illegal kickback scheme, the United States paid EMSA far in excess of $100 million dollars for false Medicare and Medicaid claims submitted for services provided by Paramedics Plus under the EMSA contract.  In fact, approximately half of EMSA's revenue from billing was paid by Medicare and Oklahoma Medicaid.  EMSA used those public funds to pay Paramedics Plus millions of dollars under the ambulance services contract.

155.     EMSA could not bill the United States for ambulance services without the services provided by Paramedics Plus personnel.  Medicare regulations found at 42 C.F.R. § 410.40, entitled "Coverage of ambulance services," state that Medicare Part B will only cover ambulance services if, among other things, "the supplier meets the applicable vehicle, staff, and billing and reporting requirements" contained at 42 C.F.R. § 410.41.  The Medicare regulations contained at 42 C.F.R. § 410.41 explicitly require the presence of certain trained vehicle staff for ambulance services to be reimbursable.  The regulations specify the staffing requirements (EMTs and/or paramedics) that must be met to bill Basic Life Support and Advanced Life Support transports to Medicare.  These requirements are also contained in the Medicare Benefit Policy

Manual under Chapter 10 – Ambulance Services.  EMSA did not employ EMTs or paramedics; instead, EMSA contracted with Paramedics Plus to provide the staff required to provide services reimbursable by Medicare.  Without a contractor, EMSA could provide no reimbursable services.

156.     Further, ETMC and Paramedics Plus submitted false claims to EMSA under the ambulance services contract.  *See* 31 U.S.C. § 3729(a)(1)(B), (b)(2)(A)(ii).  ETMC and Paramedics Plus, as EMSA's contractor, were recipients of Medicare and Medicaid money used to pay their paramedics, EMTs, and other employees.  Those employees were paid to provide services to Medicare and Oklahoma Medicaid beneficiaries.  The funds were therefore used to advance federal and state programs, and the United States provided a portion of the money requested by ETMC and Paramedics Plus from EMSA.  The requests for money did not include federal employment compensation or any income subsidies.  Because ETMC and Paramedics Plus obtained the EMSA contract through the payment of kickbacks, ETMC and Paramedics Plus were not entitled to provide reimbursable services to Medicare and Oklahoma Medicaid beneficiaries under the contract.

157.     Defendants were aware that EMSA billed Medicare and Oklahoma Medicaid for the services provided by Paramedics Plus pursuant to an illegal kickback scheme.  EMSA continuously submitted claims to Medicare and Oklahoma Medicaid for ambulance services.  EMSA used one of two National Provider Identifier (NPI) numbers, one for EMSA's Western Division (ending in 8150) and one for EMSA's Eastern Division (ending in 7646).  Each claim contained the beneficiary's identifying information, including name and date of birth.  Each claim also contained a procedure code (also known as a HCPCS code), procedure modifier to

identify origination and destination of transport, diagnostic code, place of service, and amount billed.

158.    EMSA frequently billed Medicare and Oklahoma Medicaid for the following procedure or HCPCS codes:  A0426 (Ambulance Service, Advanced Life Support, Non-Emergency Transport), A0427 (Ambulance Service, Advanced Life Support, Emergency Transport), and A0428 (Ambulance Service, Basic Life Support, Non-Emergency Transport). Each claim also requested payment for ambulance mileage under HCPCS code A0425 (Ground Mileage).  These codes could not be billed without the services provided by Paramedics Plus employees as EMSA did not employ ambulance drivers or paramedics.

159.    By way of example, on January 23, 2008, Medicare received two claims from EMSA billing $719.71 (A0427) and another $54.00 (A0425) for an emergency transport of a Medicare beneficiary with initials MM.  Medicare processed the claim on February 1, 2008, paying EMSA $279.24 for the A0427 emergency transport claim and $30.82 for the A0425 mileage claim.  The ambulance services that had to be provided as a prerequisite to billing Medicare for these claims were provided by Paramedics Plus employees.

160.    By way of further example, on September 26, 2012, Medicare received two claims from EMSA billing $1,100.00 (A0427) and another $12.60 (A0425) for an emergency transport of a Medicare beneficiary with initials RH.  Medicare processed the claim on October 5, 2012, paying EMSA $308.12 for the A0427 emergency transport claim and $7.68 for the A0425 mileage claim.  The ambulance services that had to be provided as a prerequisite to billing Medicare for these claims were provided by Paramedics Plus employees.

161.    EMSA made similar claims to Oklahoma Medicaid.  By way of example, on January 22, 2008, Oklahoma Medicaid received two claims from EMSA billing $1,100.00

(A0427) and another $54.00 (A0425) for an emergency transport of an Oklahoma Medicaid

beneficiary with initials VR.  Oklahoma Medicaid processed the claim on February 6, 2008,

paying EMSA $340.25 for the A0427 emergency transport claim and $35.40 for the A0425

mileage claim.  The ambulance services that had to be provided as a prerequisite to billing

Oklahoma Medicaid for these claims were provided by Paramedics Plus employees.

162.    By way of further example, on September 17, 2012, Oklahoma Medicaid received

two claims from EMSA billing $1,300.00 (A0427) and another $63.00 (A0425) for an

emergency transport of an Oklahoma Medicaid beneficiary with initials YO.  Oklahoma

Medicaid processed the claim on September 26, 2012, paying EMSA $329.19 for the A0427

emergency transport claim and $39.97 for the A0425 mileage claim.  The ambulance services

that had to be provided as a prerequisite to billing Oklahoma Medicaid for these claims were

provided by Paramedics Plus employees.

163.    Medicare paid EMSA over $13 million each year from 2009 through 2013.  From

2009 through 2013 alone, Medicare paid EMSA over $70 million for ambulance services

provided by Paramedics Plus.

164.    From 2009 through 2013 alone, Oklahoma Medicaid paid EMSA over $38

million for ambulance services provided by Paramedics Plus.

165.    Because EMSA's claims for Medicare and Oklahoma Medicaid reimbursement

were tainted by kickbacks, the claims were false and not payable.  Accordingly, the United States

seeks to recover its damages, along with appropriate trebling of those damages, and penalties for

each false claim submitted or caused to be submitted by Defendants.

## FIRST CLAIM FOR RELIEF

### Violations of the False Claims Act:  Presenting False Claims for Payment
**31 U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1))**

166.     The United States realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

167.     The United States seeks relief against Defendants under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1), and, as amended, 31 U.S.C. § 3729(a)(1)(A).

168.     As a result of Defendants' solicitation, receipt, offer, and/or acceptance of kickbacks to induce the award of EMSA's ambulance services contract in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), false and fraudulent claims for payment were made to federal health care programs.  Defendants' compliance with the Anti-Kickback Statute was material to the Government's decision to pay the health care claims.  Defendants knowingly caused to be presented materially false or fraudulent claims for payment or approval in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), and, as amended, 31 U.S.C. § 3729(a)(1)(A).

169.     By reason of the false or fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim.

## SECOND CLAIM FOR RELIEF

### Violations of the False Claims Act:  Use of False Statements
**31 U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. § 3729(a)(2))**

170.     The United States realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

171.     The United States seeks relief against Defendants under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. § 3729(a)(2), and, as amended, 31 U.S.C. § 3729(a)(1)(B).

172.     As a result of Defendants' solicitation, receipt, offer, and/or acceptance of kickbacks to induce the award of EMSA's ambulance services contract in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), Defendants knowingly used or caused to be made or used false records or statements that were material to false or fraudulent claims for payment submitted to federal health care programs.  Those false records or statements by Defendants include false certifications of compliance with the Anti-Kickback Statute.

173.     The United States, unaware of the falsity of the records and statements made by, used, or caused to be used by Defendants, approved, paid, and participated in payments made by federal health care programs for claims that would otherwise not have been approved and paid.

174.     By reason of these false records or statements, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim.

### THIRD CLAIM FOR RELIEF

**Violations of the False Claims Act:  Conspiracy to Violate the False Claims Act**
**31 U.S.C. § 3729(a)(1)(C) (formerly 31 U.S.C. § 3729(a)(3))**

175.     The United States realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

176.     Defendants knowingly conspired with each other and/or their employees and agents to violate 31 U.S.C. §§ 3729(a)(1)(A) and (B) and to defraud the United States by causing federal health care programs to pay for false claims relating to services arranged for through the payment of illegal kickbacks.

177.     By reason of Defendants' conspiracy, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim caused to be submitted.

46

## FOURTH CLAIM FOR RELIEF

### Fraud

178.    The United States realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

179.    Defendants made materially false representations, including material omissions of fact, to the United States and/or its agents with knowledge of their materiality and falsity.

180.    Defendants intended that the United States would rely upon the false representations and material omissions of fact.

181.    The United States relied upon Defendants' false representations and material omissions of fact and, as a result, paid Defendants money that otherwise would not have been paid.

182.    The United States has been damaged in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment

183.    The United States realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

184.    The United States paid claims submitted to federal health care programs in connection with Defendants' ambulance services based on false claims submitted to federal health care program.  Those claims violated applicable federal law and regulations, including the False Claims Act and the Anti-Kickback Statute.  The circumstances of Defendants' receipt of taxpayer money, whether directly or indirectly, are such that, in equity and good conscience, Defendants should not retain those payments, the amount of which is to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Payment by Mistake

185.    The United States realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

186.    By reason of the foregoing, the United States made and/or participated in Medicare and Oklahoma Medicaid payments in reliance on the erroneous belief that Defendants were complying with the Anti-Kickback Statute and the False Claims Act.  The erroneous belief was material to the United States' decision to make the payments.  Consequently, the United States is entitled to recover the amount of the payments in an amount to be determined at trial.

## RELIEF REQUESTED

WHEREFORE, the United States respectfully requests judgment against Defendants as follows:

a.    On Claims for Relief One, Two, and Three (False Claims Act), treble damages and civil penalties in the maximum amount allowed by law;

b.    On Claims for Relief Four, Five, and Six (Common Law), damages to the extent allowed by law;

c.    All costs associated with prosecuting this civil action, as provided by law;

d.    Interest on all amounts owed to the United States; and

e.    For all other relief the Court deems just and proper.

Respectfully submitted,

JOYCE R. BRANDA
Deputy Assistant Attorney General, Civil Division

BRIT FEATHERSTON
Acting U.S. Attorney, Eastern District of Texas

  /s/ Joshua M. Russ
JAMES GILLINGHAM
Assistant U.S. Attorney
Eastern District of Texas
Lead Attorney (per L.R. CV-11(a)(1))
110 N. College Street, Suite 700
Tyler, Texas 75702
E-mail: james.gillingham@usdoj.gov
(903) 590-1400
(903) 590-1436
Texas State Bar # 24065295

JOSHUA M. RUSS
Assistant U.S. Attorney
Eastern District of Texas
101 East Park Blvd., Suite 500
Plano, Texas 75074
E-mail: josh.m.russ@usdoj.gov
(972) 509-1201
(972) 509-1209 (fax)
Texas State Bar # 24074990

  /s/ Claire L. Norsetter
MICHAEL D. GRANSTON
ANDY J. MAO
CLAIRE L. NORSETTER
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Email:  Claire.L.Norsetter@usdoj.gov
(202) 307-1112
(202) 307-3852 (fax)

**ATTORNEYS FOR THE
UNITED STATES OF AMERICA**