**EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| and STATE OF OKLAHOMA *ex rel.* | § | |
| STEPHEN DEAN, | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 4:14-CV-203 |
| | § | |
| v. | § | Judge Mazzant |
| | § | |
| PARAMEDICS PLUS, LLC, | § | |
| EAST TEXAS MEDICAL | § | |
| CENTER REGIONAL HEALTHCARE | § | |
| SYSTEM, INC., EAST TEXAS MEDICAL | § | |
| CENTER REGIONAL HEALTH | § | |
| SERVICES, INC., EMERGENCY | § | |
| MEDICAL SERVICES AUTHORITY, | § | |
| and HERBERT STEPHEN WILLIAMSON, | § | |
| | § | |
| Defendants. | § | |

**UNITED STATES OF AMERICA'S RESPONSES AND OBJECTIONS TO**
**PARAMEDICS PLUS, LLC'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rule of Civil Procedure 33 and the Court's Rules and Orders, the United States serves these Responses and Objections to Paramedics Plus, LLC's First Set of Interrogatories.

**GENERAL OBJECTIONS**

The United States objects to any contention interrogatories on the basis that fact discovery in ongoing. The United States reserves its right to supplement its responses herein as fact discovery proceeds. *See* Fed. R. Civ. P. 33(a)(2) ("…court may order that the interrogatory need not be answered until the designated discovery is complete ….").

## RESPONSES AND OBJECTIONS TO INTERROGATORIES

1.      Describe in detail payments of money (if any) by any of the ETMC Defendants to Williamson that You contend violated the AKS.  In your answer, state the dates of any such payments, the amounts of any such payments, and sources of any such payments.

**RESPONSE:**  The United States contends the ETMC Defendants violated the Anti-Kickback Statute ("AKS") by, as explained in the United States' Complaint in Partial Intervention (Dkt. #28), making payments of money, whether directly or indirectly and with an unlawful purpose, that were enjoyed by Williamson.  The AKS prohibits the direct or indirect solicitation, receipt, offer, or payment of remuneration to gain access to Federal health care program funds.  Based on the United States' investigation and ongoing discovery in this action, the United States contends that Paramedics Plus is controlled by its ETMC parent companies and that Paramedics Plus received approval from East Texas Medical Center Regional Healthcare System, Inc., through East Texas Medical Center Regional Health Services, Inc., for the payments at issue in this action. Paramedics Plus submits Check Requisition forms seeking authority for payments, which are authorized by employees of East Texas Medical Center Regional Healthcare System, Inc.  The United States further contends that Williamson's conduct as President and CEO of EMSA binds EMSA and exposes EMSA to liability in this action for Anti-Kickback Statute violations and violations of the False Claims Act.

The categories of money payments to Williamson, whether directly or indirectly, from the ETMC Defendants that are currently known to the United States are as follows:  (1) $50,000.00 in payments earmarked to pay for Williamson's American Ambulance Association ("AAA") travel and (2) cash rebate payments made under the unwritten kickback agreement between EMSA and Paramedics Plus.  A detailed description of these categories of payments and the United States'

contentions are below.

(1) As explained in the United States' Complaint in Partial Intervention (Dkt. #28), the ETMC Defendants made at least $50,000.00 in payments earmarked for Williamson's AAA travel.  Although former Paramedics Plus Chief Operating Officer Glenn Leland has stated he believes Paramedics Plus planned to make an annual payment for Williamson's AAA travel, Paramedics Plus made at least two $25,000.00 for Williamson's AAA travel.  Paramedics Plus made the first $25,000.00 payment for Williamson's AAA travel on October 28, 2008, the same day Williamson signed the Second Modification of the EMSA ambulance services contract with Paramedics Plus. Paramedics Plus made the second $25,000.00 payment for Williamson's AAA travel on January 4, 2011.

(2)  The United States further contends that, in and around 2006 and 2007, EMSA was struggling financially.  The United States contends Williamson set out to find additional sources of revenue for EMSA, and the ETMC Defendants stepped in to improve EMSA's cash flows.  Based on the United States' investigation and ongoing discovery in this action, the ETMC Defendants made the following cash payments to EMSA or on behalf of EMSA:

PARAMEDICS PLUS
NET INCOME CAP REBATES

| Check No. | Date | Amount | Vend ID | Vendor | Description |
|---|---|---|---|---|---|
| EMSA | | | | | |
| 20849 | 3/3/2006 | 638,198.00 | 22277 | EMERGENCY MED SVCX AUTHORITY | Batch 1 - 12/19 |
| 23014 | 8/22/2006 | 24,800.00 | 33428 | BRADSHAW CONSULTING SERVICES | |
| 23604 | 10/4/2006 | 700,000.00 | 9027790 | EMSA-KENT TORRENCE | Batch 1 - 12/19 |
| 25462 | 2/22/2007 | 297,200.00 | 9027790 | EMSA-KENT TORRENCE | Batch 1 - 12/19 |
| 25673 | 3/16/2007 | 102,198.00 | 9027790 | EMSA-KENT TORRENCE | Batch 1 - 12/19 |
| 29424 | 12/5/2007 | 1,035,500.00 | 9027790 | EMSA-KENT TORRENCE | |
| 30621 | 3/7/2008 | 500,000.00 | 36092 | EMSA | |
| 33809 | 10/30/2008 | 1,025,000.00 | 36092 | EMSA | |
| 34959 | 1/28/2009 | 1,303,250.00 | 36092 | EMSA | Batch 1 - 12/19 |
| 38656 | 9/15/2009 | 1,000,000.00 | 9027790 | EMSA-KENT TORRENCE | Batch 1 - 12/19 |
| 39954 | 12/4/2009 | 874,000.00 | 36092 | EMSA | Batch 1 - 12/19 |
| 42143 | 4/6/2010 | 300,000.00 | 36092 | EMSA | Batch 1 - 12/19 |
| 43740 | 7/2/2010 | 1,000,000.00 | 36092 | EMSA | Batch 1 - 12/19 |
| 46106 | 11/8/2010 | 5,738.00 | 9063773 | IN MOTION TECHNOLOGY | |
| 46106 | 11/8/2010 | 276,017.00 | 9063773 | IN MOTION TECHNOLOGY | |
| 46531 | 12/7/2010 | 17,640.00 | 9063773 | IN MOTION TECHNOLOGY | |
| WIRE | 12/6/2010 | 2,906,995.00 | | EMSA | Batch 1 - 12/19 |
| 47123 | 1/4/2011 | 25,000.00 | 36092 | EMSA | Batch 1 - 12/19 |
| 48310 | 3/4/2011 | 400,000.00 | 36092 | EMSA | Batch 1 - 12/19 |
| WIRE | 7/18/2011 | 2,000,000.00 | | EMSA | Batch 1 - 12/19 |
| 52889 | 10/6/2011 | 1,500,000.00 | MPMP719 | EMSA | Batch 1 - 12/19 |
| 53379 | 10/26/2011 | 37,035.00 | MPMP772 | CONNELLY PAVING CO. | |
| 53245 | 10/20/2011 | 366,691.17 | MCO1321 | ZOLL DATA SYSTEMS | Batch 1 - 12/19 |
| WIRE | 11/21/2011 | 1,210,633.83 | | EMSA | Batch 1 - 12/19 |
| 55001 | 1/4/2012 | 11,440.00 | MPMP730 | CCASLIN CONSTRUCTION | |
| 55001 | 1/4/2012 | 142.85 | MPMP730 | CCASLIN CONSTRUCTION | |
| 55001 | 1/4/2012 | 2,840.14 | MPMP730 | CCASLIN CONSTRUCTION | |
| 60207 | 7/27/2012 | 2,000,000.00 | MPMP719 | EMSA | |
| 65033 | 1/24/2013 | 1,089,077.00 | MPMP719 | EMSA | |
| | | 20,649,395.99 | | | |

Based on the United States' investigation and ongoing discovery in this action, EMSA did not segregate payments made to it by the ETMC Defendants from its other accounts, resulting in co-mingling of kickback payments with operating funds.  The United States contends that at least some portion of these rebate funds paid by the ETMC Defendants were used to pay for salaries and expenses of EMSA employees, including Williamson.  For example, the United States contends that at least some portion of these rebate funds paid by the ETMC Defendants were used

by EMSA to send EMSA employees, including Williamson, Lara O'Leary, Frank Gresh, and Angela Lehman, on an expensive trip to a Miami Beach ambulance conference in July and August 2011.  East Texas Medical Center Regional Healthcare System, Inc. wired EMSA $2,000,000.00 on July 18, 2011.  It appears Williamson checked into his Loews Miami Beach hotel on July 24, 2011, less than a week after East Texas Medical Center Regional Healthcare System, Inc. wired EMSA $2,000,000.00.  The United States contends that each offer and payment of remuneration to either EMSA or Williamson, directly or indirectly, was an inducement or reward in exchange for Federal health care program business in violation of the Anti-Kickback Statute.

2.      Describe in detail payments of remuneration other than money (if any) by any of the ETMC Defendants to Williamson that You contend violated the AKS.  In your answer, state the dates of any such payments, the amounts of any such payments, and sources of any such payments.

**RESPONSE:**  The United States incorporates its response to Interrogatory 1 herein.  In addition to any non-monetary value Williamson received or enjoyed from the items described in response to Interrogatory 1 above, the United States discovered during its investigation and in discovery in this action that Paramedics Plus gave Williamson at least $5,000.00 in steaks between December 2008 and December 2011.  The dates of purchase and amounts of these steak gifts to Williamson are as follows:

- 12/30/2008:  $1,029.00
- 12/11/2009:  $1,334.00
- 12/7/2010:  $1,322.00
- 11/30/2011:  $1,367.00

In a meeting between former Paramedics Plus COO Glenn Leland and Williamson on December 29, 2008, Williamson "confirmed that he would like the traditional holiday present," which leads

the United States to believe that other holiday presents had previously been provided to Williamson.  The United States contends that Williamson attended dinners with Paramedics Plus employees that were paid for by Paramedics Plus.  The United States continues to seek in discovery the details of these dinners.

In addition, as detailed in the United States' Complaint in Partial Intervention (Dkt. #28), Williamson sought and directed political contributions from Paramedics Plus.  These political contributions appear to have been authorized by employees of East Texas Medical Center Regional Healthcare System, Inc.  Some politicians or groups sought contributions from Paramedics Plus through Williamson, meaning the contributions that came in from Paramedics Plus at Williamson's behest likely reflected favorably upon Williamson with the particular candidate, group, or politician.  The United States contends that Williamson would not have directed Paramedics Plus to make political contributions if those contributions were not beneficial or potentially beneficial to Williamson.  The United States contends that political contributions constitute remuneration in this action to the extent they were specifically sought by EMSA or Williamson.  Although discovery is ongoing, a list of contributions requested by EMSA or Williamson currently known to the United States is as follows:

- 1/17/2007:  Pennwood PAC Contribution for $1,000.00
- 4/7/2009:  Black Caucus Contribution for $1,500.00
- 1/12/2010:  Dewey Bartlett Campaign Contribution for $1,000.00
- 9/30/2010:  Kim Holland for Insurance Commissioner Contribution for $2,000.00
- 2/16/2011:  Swinton for Council Contribution for $1,000.00
- 3/15/2011:  Swinton for Council Contribution for $1,000.00
- 1/5/2012:  OSRSC Contribution for $1,000.00
- 3/14/2013:  OSRSC Senate Dinner Contribution for $1,000.00

Paramedics Plus made additional political contributions in Oklahoma, and the United States is determining in discovery if other contributions were made pursuant to a request from Williamson. The United States contends that Paramedics Plus offered and paid monetary and non-monetary

remuneration to EMSA and Williamson, whether directly or indirectly, as inducements to obtain the EMSA ambulance services contract, extend the EMSA ambulance services contract in 2008, maintain the EMSA ambulance services contract (which was subject to termination), and in an attempt to obtain the 2013 EMSA ambulance services contract.  The United States contends that each of these offers and payments of remuneration to either EMSA or Williamson, directly or indirectly, was an inducement or reward in exchange for Federal health care program business in violation of the Anti-Kickback Statute.

3.    Describe in detail offers of remuneration (if any) made by any of the ETMC Defendants to Williamson that you contend violated the AKS.  In your answer, state the dates of any such offers, describe how any such offers were made and/or communicated, and identify the person(s) who made and/or communicated any such offers.

**RESPONSE:**  The United States incorporates its responses to Interrogatories 1 and 2 herein.  The United States contends that all instances of remuneration received or enjoyed by Williamson, directly or indirectly, that were provided or paid by the ETMC Defendants were necessarily offers of remuneration.   The payments and offers of remuneration described in responses to Interrogatories 1 and 2 were made by the ETMC Defendants through their executives and employees, including Anthony Myers, Ron Schwartz, Byron Hale, Joanne McNeil, Glenn Leland, and Stephen Dean. Discovery is ongoing and may establish additional ETMC Defendant executives and employees involved in the offer and exchange of remuneration over the relevant time period.

4.      Describe in detail payments of money (if any) by any of the ETMC Defendants to EMSA that You contend violated the AKS.  In your answer, state the dates of any such payments, the amounts of any such payments, and sources of any such payments.

**RESPONSE:** The United States incorporates its response to Interrogatories 1 and 2 herein.  In addition to the details provided in response to Interrogatories 1 and 2 herein, Paramedics Plus allowed EMSA to offset monthly payments owed to Paramedics Plus with deductions for purchases made by EMSA.  In other words, EMSA paid for items or services and deducted those costs from the amounts owed to Paramedics Plus under the EMSA ambulance services contract.

An audit conducted by an Oklahoma State Auditor and Inspector for the time period of January 1, 2009 through June 30, 2012 found that EMSA reduced payments owed to Paramedics Plus under the EMSA ambulance services contract by $7,120,888.00.  The Oklahoma State Auditor and Inspector questioned the appropriateness of this arrangement, which may have helped Paramedics Plus avoid taxes.  In fact, at an EMSA Board of Trustees meeting on March 27, 2013, Paramedics Plus President Ron Schwartz apparently claimed that sales tax avoidance increased rebate payments to EMSA.

The United States contends that many of the payments reimbursed by Paramedics Plus through EMSA decreasing amounts owed to Paramedics Plus (apparently without objection from Paramedics Plus) under the EMSA ambulance services agreement constitute unlawful remuneration in violation of the Anti-Kickback Statute.  Discovery is ongoing, and the documents produced by the ETMC Defendants appear to show some of these reimbursements between January 2009 and May 2012.  The United States is conducting discovery into the time periods before January 2009 and after May 2012 to determine if there were any additional offset reimbursements. The United States is currently aware of the following reimbursement descriptions

for amounts reimbursed to EMSA, which the United States contends constitute remuneration under

the Anti-Kickback Statute:

- February 2009:  Tulsa Select Christmas party for $4,404.70
- May 2009:  Leadership Oklahoma on behalf of EMSA for $4,100.41
- July 2009:  Dr. Sacra retirement for $4,704.52
- August 2009:  Thank you to Tina Wells Stars of Life Hostess for $415.00
- December 2009:  Tulsa Holiday party for $650.00
- January 2010:  Tulsa Holiday Party for $3,185.51, $500.00, and $650.00
- February 2010:  Leadership Oklahoma in Tulsa for $1,755.50
- March 2010:  Leadership Oklahoma expense against rebate for $630.00
- March 2010:  Leadership Oklahoma expense against rebate for $1,140.00
- April 2010: Leadership Oklahoma expense against rebate for $2,000.00
- April 2010:  Stars of Life Registrations for $2,350.00
- April 2010:  December Christmas Party Deposit for $250.00
- October 2010:  Gift to Jeannie Sacra for CAAS appreciation for $490.00 (with annotation "Steve charging back to P+ from rebate" and "2013 comment:  2nd spa expense")
- October 2010:  Tina Wells going away gift, against EMSA rebate for $1,265.27 (with annotation "Steve charging back to P+ against [EMSA] rebate")
- October 2010:  Car Seat Grant gift to mgrs., the end of the grant for $770.00 (with annotation "Steve charging back to P+ against [EMSA] rebate")
- January 2011:  Reimbursement for approximately $5,000.00 for Tulsa Christmas Party music, food and facility, decorations, and DJ
- February 2011:  Leadership OK on behalf of EMSA for $1,000.00
- July 2011:  Lobbyist thank you on behalf of EMSA for $257.62
- October 2011:  AAA annual convention paying on EMSA behalf for $1,000.00
- October 2011:  Replay Photos paying on EMSA behalf per SW for $179.90
- December 2011:  Retirement gift for Jack Eades paid on behalf of EMSA for $164.90
- April 2012:  Contribution to First Tee Tournament on behalf of EMSA for $5,000.00
- May 2012:  TV for AAA raffle paid for on behalf of EMSA for $1,439.99

5.      Describe in detail payments of remuneration other than money (if any) by any of the ETMC

Defendants to EMSA that You contend violated the AKS. In your answer, state the dates

of any such payments, the amounts of any such payments, and sources of any such

payments.

**RESPONSE:** The United States incorporates its responses to Interrogatories 1, 2, and 4 herein.

Although discovery is ongoing, the United States is further aware of the following non-monetary

remuneration provided to EMSA or its employees:

- 12/23/2008 –  $4,404.70 for EMSA Holiday party
- 9/2/2009 –  $805.00 for Jeannie Sacra and Pam Stottman gift of Mont Blanc pens
- 12/11/2009 –  $444.90 in steaks for Dr. John Sacra
- 3/18/2010 –  $1,160.29 for Tina Wells gift of Mont Blanc conference folder and doue silver pen
- 8/12/2010 –  $490 for Jeannie Sacra spa visit to Ihloff Salon
- 12/8/2010 –  $444.87 in steaks for Dr. John Sacra
- 12/10/2010 –  $444.87 in steaks for Dr. Jeff Goodloe

Evidence obtained in this action establishes that Steve Williamson purchased or ordered some of

the above items through EMSA and billed Paramedics Plus for the gift or service.  The United

States contends Paramedics Plus's reimbursement of gifts or services arranged by Williamson also

constitutes a purchase for Williamson or at his request.

6.      Describe in detail offers of remuneration (if any) made by any of the ETMC Defendants to EMSA that You contend violated the AKS.  In your answer, state the dates of any such offers, describe how any such offers were made and/or communicated, and identify the person(s) who made and/or communicated any such offers and the persons to whom such offers were made and/or communicated.

**RESPONSE:** The United States incorporates its responses to Interrogatories 1, 2, and 4 herein. The United States contends that all instances of remuneration received or enjoyed by EMSA, directly or indirectly, that were provided or paid by the ETMC Defendants were necessarily offers of remuneration.   The payments and offers of remuneration described in responses to Interrogatories 1, 2, and 4 were made by the ETMC Defendants through their executives and employees, including Anthony Myers, Ron Schwartz, Byron Hale, Joanne McNeil, Glenn Leland, and Stephen Dean.   Discovery is ongoing and may establish additional ETMC Defendant executives and employees involved in the offer and exchange of remuneration over the relevant time period.

7.      If You contend the ETMC Defendants induced purchases, leases and/or orders in violation of the AKS, identify and describe all such purchases leases and/or orders.

**RESPONSE:** The United States contends the ETMC Defendants unlawfully induced EMSA to purchase and/or order Paramedics Plus's ambulance services, which were paid for in part by Medicare and Oklahoma Medicaid.    EMSA purchased and/or ordered Paramedics Plus's ambulance services continuously from November 1998 through October 2013.

8.     Describe the factual and legal basis for Your contention that PMP caused EMSA to submit false claims in violation of the FCA.

**RESPONSE:** The United States explains, in detail, the factual and legal basis for its contention that Paramedics Plus caused EMSA to submit false claims in violation of the False Claims Act in its Complaint in Partial Intervention (Dkt. #28) as well as its motion to dismiss briefing in this action.  As explained there, Paramedics Plus offered and paid remuneration, directly or indirectly, to EMSA and Williamson with an unlawful purpose, each instance of which is a violation of the Anti-Kickback Statute.   EMSA billed Medicare and Oklahoma Medicaid while expressly or impliedly certifying compliance with the Anti-Kickback Statute.   Compliance with the Anti-Kickback Statute is a condition of receiving any Medicare or Medicaid payment.   EMSA's certifications of compliance with the Anti-Kickback Statute were false, resulting in Medicare and Oklahoma Medicaid paying ambulance services claims tainted by Anti-Kickback Statute violations.   Paramedics Plus's ambulance services, as EMSA's exclusive ambulance service provider, were a prerequisite to EMSA billing Medicare and Oklahoma Medicaid.   Paramedics Plus participated in the kickback scheme, knew EMSA certified compliance with the Anti-Kickback Statute as a Medicare supplier, did not alert the United States that such a scheme was in place, and continued to share in taxpayer monies received by EMSA.   The United States does not pay health care claims that are submitted in violation of the Anti-Kickback Statute, and all participants in an illegal kickback scheme may be held liable for repayment of unlawfully obtained taxpayer funds.

9.      Describe any and all alleged fraudulent representations that You contend were made by the ETMC Defendants: (i) to the Government and/or (ii) upon which the Government allegedly relied.  In your answer, identify the person(s) who made any such representation, the date of any such representation, the person(s) to whom any such representation was made, and the content of any such representation.

**RESPONSE:** The United States incorporates its responses to Interrogatories 1, 2, and 4 herein. As detailed in the confidential claims data produced by the United States in this action at USA_0015826, EMSA submitted over 380,000 ambulance claims to the United States between 2006 and October 2013.  EMSA's claims for reimbursement falsely certified, expressly or impliedly, that the services for which reimbursement was being sought were provided in compliance with the Anti-Kickback Statute.  Pursuant to the arrangement between EMSA and Paramedics Plus, the ETMC Defendants were aware that EMSA billed Federal health care programs for services provided by Paramedics Plus.   Paramedics Plus submitted run report information to EMSA for each ambulance run, and EMSA used that information to bill Federal health care programs.  Paramedics Plus omitted from each run report submitted to EMSA to be used for billing the fact that the services were arranged in part through an unlawful kickback scheme.  EMSA then billed each claim while, although certifying compliance with the Anti-Kickback Statute, omitting any reference to the remuneration offered and paid by the ETMC Defendants, directly or indirectly, to EMSA or Williamson.  Paramedics Plus both omitted material information regarding Anti-Kickback Statute compliance when submitting run report information to EMSA and used EMSA's billing of Federal health care programs to gain access to undeserved taxpayer funds.  Discovery is ongoing, and the United States is seeking the names of individuals

involved who submitted run report data to EMSA that was then used for each false claim submitted to the United States.

10.     State the: (i) total number of Medicare and Medicaid claims, (ii) the total dollar amount paid for such claims and (iii) dates of payments for all such claims submitted by or on behalf of EMSA for which You paid or authorized payment after You first learned of the profit-cap agreement between AMR and EMSA.

**RESPONSE:** The United States objects to this interrogatory as it seeks information outside the scope of Federal Rule of Civil Procedure 26.  The information sought concerns a different ambulance contractor not a party to the United States' claims, an ambulance contract not at issue in this action, and a time period that is not relevant to the false claims alleged in this case.

11.     State the: (i) total number of Medicare and Medicaid claims, (ii) the total dollar amount paid for such claims and (iii) dates of payments for all such claims submitted by or on behalf of Pinellas County for which You paid or authorized payment after You first learned of the profit-cap agreement between PMP and Pinellas County.

**RESPONSE:** The United States objects to this interrogatory as it seeks information outside the scope of Federal Rule of Civil Procedure 26.  The information sought concerns conduct not at issue in this action from a municipal entity not located in Oklahoma and during a time period that is not relevant to the false claims alleged in this case.

12.     State the: (i) total number of Medicare and Medicaid claims, (ii) the total dollar amount paid for such claims and (iii) dates of payments for all such claims submitted by or on behalf of Alameda County for which You paid or authorized payment after You first learned of the profit-cap agreement between PMP and Alameda County.

**RESPONSE:** The United States objects to this interrogatory as it seeks information outside the scope of Federal Rule of Civil Procedure 26.  The information sought concerns conduct not at issue in this action from a municipal entity not located in Oklahoma and during a time period that is not relevant to the false claims alleged in this case.

13.     State the: (i) total number of Medicare and Medicaid claims, (ii) the total dollar amount paid for such claims and (iii) dates of payments for all such claims submitted by or on behalf of Three Rivers for which You paid or authorized payment after You first learned of the profit-cap agreement between PMP and Three Rivers.

**RESPONSE:** The United States objects to this interrogatory as it seeks information outside the scope of Federal Rule of Civil Procedure 26.  The information sought concerns conduct not at issue in this action from a municipal entity not located in Oklahoma and during a time period that is not relevant to the false claims alleged in this case.

The United States further objects to this request because it is confusing and misleading. The United States' investigation showed that Paramedics Plus offered a profit-cap arrangement to Three Rivers.  However, Three Rivers contended that any profit cap offer was not incorporated into a contract between Three Rivers and Paramedics Plus to the extent it violated the Anti-Kickback Statute.  This interrogatory assumes there is an agreement in place between Paramedics Plus and Three Rivers to cap profits, which appears is not certain.

14.     Identify and describe any instance in which You denied a Medicare or Medicaid claim for reimbursement because the medical provider had entered into a profit-cap agreement with a third-party contractor.

**RESPONSE:** The United States objects to this interrogatory because it is misleading.  First, Paramedics Plus appears to have created the term "profit cap" for purposes of ambulance services contracts.   To the extent sharing profit is remuneration, then a "profit cap" as created by Paramedics Plus satisfies the remuneration element of the Anti-Kickback Statute.  Second, as the United States explains in its Complaint in Partial Intervention (Dkt. #28), Defendants' conduct (*i.e.*, the knowing offer and exchange of remuneration with un unlawful purpose, regardless of what Defendants called the arrangement) in this action violated the Anti-Kickback Statute ("AKS").   The AKS does not enumerate the many ways persons may exchange, or offer to exchange, remuneration.

The United States further objects to this interrogatory to the extent it seeks information outside the scope of Federal Rule of Civil Procedure 26.  The information sought relates to conduct not at issue in this action regarding municipal entities in various states other than Oklahoma and during a time period that is not relevant to the false claims alleged in this case.  The United States has denied reimbursement for claims tainted by potential AKS violations resulting from profit-cap arrangements.  For example, the United States settled with Pinellas EMSA in this action alleging Pinellas EMSA violated the AKS when it accepted Paramedics Plus's offer of entering into a profit-cap agreement and then accepting money under that arrangement.  Under the terms of that settlement agreement, Pinellas EMSA not only paid a settlement amount to the United States, but Pinellas EMSA also agreed not to submit certain claims that were tainted by potential AKS violations arising from the acceptance of profit-sharing/profit-capping terms and money offered

by Paramedics Plus.  Because AKS compliance is a prerequisite to Medicare and Medicaid reimbursement, the United States, through its settlement agreement with Pinellas EMSA, denied payment—or even submission—of claims tainted by potential AKS violations arising from the receipt of remuneration in the form of a profit cap as well as money that was transmitted under the applicable profit cap offered by Paramedics Plus.  Pinellas EMSA represented that the settlement prohibited the submission or payment of hundreds of thousands, if not millions, of dollars in Medicare and Medicaid claims.  Alameda County agreed to similar settlement provisions.

15.     Identify and describe all facts concerning the alleged 1997 meeting between Williamson and Meyers described in paragraph seven of Your Complaint, including identifying all individuals with factual knowledge of this meeting.

**RESPONSE:** During the United States' investigation into the *qui tam* allegations brought by Relator Stephen Dean, counsel for the United States had multiple meetings with counsel for Defendants.  Counsel for the United States had at least three meetings and multiple telephone conference calls with counsel for Paramedics Plus to discuss the allegations in this action.  During a meeting in March 2016, counsel for Paramedics Plus presented information to address concerns raised by the United States in a prior meeting related to the Anti-Kickback Statute and an unwritten profit-cap agreement between Paramedics Plus and EMSA.  Counsel for Paramedics Plus relayed that the profit cap arrangement arose in and around 2004 when Stephen Williamson sought out Tony Myers at an ambulance conference in Florida.  Counsel for Paramedics Plus portrayed Stephen Williamson as the person who solicited a profit cap arrangement with Paramedics Plus, stating that EMSA was having financial difficulties at the time.

Subsequent to the March 2016 meeting between counsel for the United States and counsel for Paramedics Plus, counsel for Paramedics Plus relayed a different version of the facts, stating that the profit cap arrangement was actually in writing as early as 1998. Documents in this action show that Paramedics Plus highlighted at an EMSA meeting that Paramedics Plus was the first ambulance company to offer a profit cap in 1998. Internal email correspondence between Paramedics Plus employees establishes that Paramedics Plus met the profit cap threshold every year except the first year under the EMSA contract.

It appears counsel for Paramedics Plus was provided inaccurate information from Paramedics Plus; namely, that the profit cap arrangement began in and around 2004. Accordingly, the ambulance industry conference meeting in Florida between Williamson and Myers described by counsel for Paramedics Plus necessarily took place prior to the 1998 contract execution with EMSA. Otis Carroll, counsel for Paramedics Plus, has factual knowledge concerning this meeting, which presumably came from Paramedics Plus representatives during the course of Mr. Carroll's representation of the ETMC Defendants. The United States is seeking in discovery additional information from Defendants related to this meeting.


16.    If You contend that Paramedics Plus violated the law by making political contributions in Oklahoma, provide and describe the legal authority for such contention, including Your standing to make such a contention.

**RESPONSE:** The United States objects to this interrogatory as it calls for a legal conclusion and requires the United States to marshal legal opinions. The United States contends that political contributions made by Paramedics Plus at the behest of Stephen Williamson and EMSA are remuneration under the Anti-Kickback Statute and were paid in an effort to obtain or retain the

EMSA contract.  In addition, the United States contends that the targeted political contributions were designed to help ensure the existence of EMSA, which allowed EMSA the opportunity to continue billing Medicare and Oklahoma Medicaid, allowed Williamson to continue enjoying a substantial salary and valuable benefits as EMSA's President and CEO, and allowed Paramedics Plus to maintain its most lucrative ambulance services contract.  Accordingly, the United States contends this conduct violated the Anti-Kickback Statute.  The United States has standing to enforce the Anti-Kickback Statute alone or in conjunction with a civil False Claims Act action.

In addition, the United States contends that Paramedics Plus potentially violated Oklahoma criminal law, including 21 O.S. § 187.2, when making the political contributions requested by Williamson.  The United States contends that the remuneration paid by the ETMC Defendants in this action belonged to the ETMC Defendants.  However, some Defendants have argued in this action that the money paid by the ETMC Defendants always belonged to EMSA.  While the United States disputes this contention, if true, Paramedics Plus likely also violated 21 O.S. § 187.1 by making political contributions with EMSA's funds.  The United States has not alleged causes of action in this case under these Oklahoma statutes.  However, the potential illegal nature of the political contributions is relevant to the United States' False Claims Act action as it tends to establish that Defendants acted with a wrongful purpose in connection with the remuneration offered, solicited, received, and paid in violation of the Anti-Kickback Statute.

17.     Identify all facts supporting Your contention that the profit-cap agreement between PMP and EMSA was concealed as alleged in your complaint.

**RESPONSE:** During the United States' investigation into the *qui tam* allegations brought by Relator Stephen Dean, the United States learned that Paramedics Plus and EMSA had an unwritten

arrangement whereby Paramedics Plus paid money to EMSA or reimbursed EMSA for expenses. This unwritten arrangement lasted from November 1998 through October 2013.  Some employees of the ETMC Defendants and EMSA (including Williamson) informally referred to this arrangement by different euphemisms—including a "rebate," a "profit cap," the "surplus," and "gain sharing"—and they referred to this non-contractual arrangement in an attempt to justify the exchange of remuneration—remuneration that included payments for Williamson's American Ambulance Association travel and political contributions directed by Williamson.

During the United States' investigation, former Paramedics Plus COO Glenn Leland stated that he informed then-President of Paramedics Plus Tony Myers that the unwritten arrangement should be written into the 2008 contract modification.  This is the modification that resulted in a five-year extension for Paramedics Plus, which Paramedics Plus obtained in part by offering to improve EMSA's cash flows.  The 2008 modification remained silent as to the arrangement.  In fact, as explained in the United States' Complaint in Partial Intervention (Dkt. #28), over the course of the 15-year relationship between EMSA and Paramedics Plus, so-called "profit cap" terms never made their way legitimately into a contract.  To be clear, EMSA and Paramedics Plus did prepare an undated letter in 2012 containing inaccurate information and placed the letter into a 2010 contract modification soon before an Oklahoma auditor arrived to look into allegations unrelated to Anti-Kickback Statute compliance.  However, the United States contends this letter was intended as a cover-up rather than a legitimate addition to a prior contract modification.  In addition, the contract documents executed by EMSA and Paramedics Plus state that there are no oral agreements, which was apparently false.

In addition, in 2007—after a confidential PowerPoint prepared by Glenn Leland was presented to EMSA and Williamson, offering to improve EMSA's cash flows—Williamson

presented a case for a five-year extension to the EMSA Board of Trustees.   Williamson's PowerPoint presentation was silent as to any profit cap percentage or threshold.

EMSA and Paramedics Plus apparently also intended the so-called "profit cap" or "surplus" arrangement to allow for political contributions directed by Williamson to be paid by Paramedics Plus.  As explained in detail in the United States Complaint in Partial Intervention (Dkt. #28), Ed Shadid asked EMSA employees on September 15, 2011 about political contributions made by Paramedics Plus or EMSA.  Williamson responded that EMSA "does not possess information that would allow it to respond on behalf of Paramedics Plus with regard to its business activities," concealing that Williamson did in fact know he had asked Paramedics Plus to make contributions (some of which were "rebated" by Paramedics Plus).

Discovery is ongoing and the United States expects to continue to find examples of half-truths and failures to explain how the arrangement between Paramedics Plus and EMSA operated. Based on the United States' investigation, the United States has not seen one instance whereby anyone at EMSA or Paramedics Plus explained the full breadth of the unwritten remuneration arrangement, including that an agreement allowed for political contributions, pre-payments of rebates, interest-free loans, that Williamson could choose what items to bill back to Paramedics Plus, and that $50,000.00 was rebated for Williamsons' American Ambulance Association travel. Failing to disclose the operation of the arrangement constitutes an ongoing concealment.  In fact, the United States' investigation uncovered that some EMSA Board of Trustee members were not aware that the so-called "profit cap" was not written into a contract.  The United States contends that the executives at EMSA and Paramedics Plus concealed from at least some members of the EMSA Board of Trustees even the basic fact of whether the arrangement was written, let alone how the money was used

18.     Identify and describe all such direct payments made to EMSA's marketer, Mike Duncan, for marketing services provided to EMSA as alleged in paragraph 76 of Your complaint.

**RESPONSE:** During the United States' investigation into the *qui tam* allegations brought by Relator Stephen Dean, the United States learned that Paramedics Plus made payments to a man named Mike Duncan for marketing services provided to EMSA.  Documents received from Paramedics Plus during the investigation and in discovery in this case confirm that Mr. Duncan did provide services requested by EMSA and Paramedics Plus paid for some of those services. The United States continues to find evidence of payments made to Mr. Duncan in discovery.

As of the date of this response, the United States has uncovered evidence of over $50,000.00 in payments made to Mr. Duncan from 2006 through 2012 for work that appears to be related to EMSA.  Although discovery will need to be completed to establish a full picture of all payments to Mr. Duncan, the United States points Paramedics Plus to its own documents showing payments to Mr. Duncan.  For instance, Paramedics Plus produced invoices from Mike Duncan for various services, including public relations.  Some of those invoices contain apparent hand-written account codes for ETMC or Paramedics Plus.  Three invoices, dated January 31, 2006, February 20, 2006, and February 22, 2006, each billed Paramedics Plus $1,000.00.

By way of further example, Paramedics Plus received a $6,000.00 invoice from Mike Duncan on March 8, 2010, with a description of service for a video "requested by EMSA." Further, an email between Joanne McNeil and Shawna Shacklett with a subject line "RE: Invoice attached Mike Duncan Stillwater RFP" shows that Paramedics Plus employee Joanne McNeil sent a $3,750.00 Mike Duncan invoice to ETMC employee Shawna Shacklett to pay.  This email chain shows EMSA authorized Paramedics Plus to pay the "Stillwater RFP bills thru their rebate code."

The Mike Duncan invoice payment was apparently intended to be booked against "the EMSA rebate code."

By way of further example, on September 9, 2011, Paramedics Plus received at least three invoices in the amount of $7,500.00 (for an apparent total of $22,500.00) for videos apparently prepared by Mr. Duncan.  Copies of the invoices show accounting code 4510.867 handwritten on the invoice.  The invoices appear to bear Joanne McNeil's initials and two contain a handwritten instruction to "Shawna" to "send to Joanne in OKC."  All three of these invoices establish that the services were "ordered by EMSA."

Documents produced by the ETMC Defendants further show ledger entries of checks paid to Mike Duncan as follows:

- 5/8/2008 - $2,000 – Mike Duncan – Check Number 31443
- 6/1/2008 - $1,400 – Mike Duncan – Check Number 31902
- 6/2/2008 - $400 – Mike Duncan – Check Number 31671
- 6/4/2008 - $1,000 – Mike Duncan – Check Number 31801
- 2/11/2009 - $400 – Mike Duncan – Check Number 35241
- 5/6/2009 - $250 – Mike Duncan – Check Number 36581
- 5/6/2009 - $250 – Mike Duncan – Check Number 36581
- 5/6/2009 - $500 – Mike Duncan – Check Number 36581
- 5/18/2009 - $500 – Mike Duncan – Check Number 36581
- 6/22/2009 - $400 – Mike Duncan – Check Number 37133
- 11/09/2009 - $4,000 – Mike Duncan – Check Number 39676
- 11/17/2009 - $4,000 – Mike Duncan – Check Number 39676
- 11/9/2009 - $4000 – Mike Duncan – Check Number 39676
- 3/8/2010 - $6,000 - Mike Duncan – Check Number 41726
- 5/10/2017 - $3,750 – Mike Duncan – Check Number 42953
- 5/12/2017 - $4,000 – Mike Duncan – Check Number 42752
- 6/18/2010 - $3,750 – Mike Duncan – Check Number 43692
- 7/20/2010 - $2,500 – Mike Duncan – Check Number 44086
- 7/21/2010 - $2,000 – Mike Duncan – Check Number 44086
- 8/1/2010 - $2,500 – Mike Duncan – Check Number 44253
- 12/3/2010 - $1,600 – Mike Duncan – Check Number 46565
- 1/4/2011 - $100 – Mike Duncan – Check Number 47135

Discovery is ongoing, and the United States does not yet know from discovery how many of these payments were related to services requested by EMSA or services otherwise for EMSA's benefit.

19.     Identify all gifts, spa services and/or parties that Paramedics Plus purchased for EMSA employees as alleged in Your complaint.

**RESPONSE:** The United States incorporates its responses to Interrogatories 1, 2, and 4 herein. In addition to the gifts and parties explained in responses to Interrogatories 1, 2, and 4, the United States' investigation and discovery and in this action have uncovered the following gifts, spas services, and/or parties paid for by Paramedics Plus:

- 12/23/2008 –  $4,404.70 – EMSA Holiday party
- 9/2/2009 –  $805.00 – Jeannie Sacra and Pam Stottman gift of Mont Blanc pens
- 3/18/2010 – $1,160.29 – Tina Wells gift of Mont Blanc conference folder and doue silver pen
- 8/12/2010 –  $490 – Jeannie Sacra spa visit to Ihloff Salon

Evidence obtained in this action establishes that Steve Williamson purchased or ordered some of the above items through EMSA and billed Paramedics Plus for the gift or service.  The United States contends Paramedics Plus's reimbursement of gifts or services arranged by Williamson also constitutes a purchase for Williamson or at his request.  Discovery in this action also suggests that an additional $415.00 spa visit was reimbursed by Paramedics Plus, but it is unclear who received those services and on what date.  Discovery into these issues is ongoing.

20.     If You contend that patient care was compromised as a result of any of the allegations in Your complaint, identify and describe all facts to support such contention.

**RESPONSE:** The United States contends that patient care was compromised by Paramedics Plus and EMSA when Paramedics Plus forewent expenses (such as scheduler training), employee wage increases, and retention bonuses for paramedics and EMTs, opting instead to pay voluntary rebate payments to EMSA.  Discovery is ongoing, but the United States expects testimony in this action to establish that Paramedics Plus suffered debilitating turnover rates among its paramedics and EMTs, which could have been slowed through the payment of higher wages and/or retention bonuses.  In 2012, Paramedics Plus's consultant, Ed Rose, explained to Paramedics Plus that its voluntary rebate arrangement was affecting the entity's "fiscal judgment."   Glenn Leland explained in a March 24, 2009 email to Stephen Dean that Tony Myers was against the payment of retention bonuses because he was "worried that we will not have enough excess profits to make Steve whole."  Months later, in a September 11, 2009 email, Leland confirmed to Myers that "the discontinued retention bonus (as compared to budget) has increased our EMSA rebate from an average of $145k per month to $249k per month."  The United States expects testimony in this case to establish that the high turnover rate among paramedics and EMTs employed by Paramedics Plus resulted in over-worked health care professionals, negatively affected employee morale, and compromised the level of care and services provided.  The United States contends Paramedics Plus's prioritization of rebate payments to EMSA had very real effects on the care provided to Medicare and Medicaid beneficiaries, which is one of the many reasons the United States refuses to pay for services arranged through unlawful inducements.

21.     Identify all HHS-OIG guidelines and/or opinions that support Your contentions made in

Your Complaint.

**RESPONSE:** The United States objects to this interrogatory as it requires the Government to

marshal legal materials and requires legal conclusions from Government counsel.  The United

States contends that all HHS-OIG advisory opinions, regulations, and guidelines related to the

Anti-Kickback Statute support the United States' contentions in this action that offering, paying,

soliciting, or receiving anything of value with the requisite mental state as an inducement to gain

access to Federal health care program patients violates the Anti-Kickback Statute.


22.     Identify all HHS-OIG guidelines and/or opinions that address profit cap agreements.

**RESPONSE:** The United States objects to this interrogatory as it requires the Government to

marshal legal materials and requires legal conclusions from Government counsel.  The United

States contends that all HHS-OIG advisory opinions, regulations, and guidelines related to the

Anti-Kickback Statute address offering, paying, soliciting, or receiving anything of value as an

inducement to gain access to Federal health care program patients, which includes profit sharing,

rebate arrangements, and money paid under those arrangements.  The United States is not aware

of HHS-OIG guidelines or opinions that use the phrase "profit cap," which is just one of the various

euphemisms Paramedics Plus used to describe its cash payment arrangement with EMSA.

23.     If You contend that profit cap agreements (written and/or unwritten) are unlawful, give the factual and legal basis for Your contention.

**RESPONSE:** The United States objects to this request because it calls for a legal conclusion and is misleading as to the elements of an Anti-Kickback Statute violation.  Paramedics Plus appears to have created the term "profit cap" for purposes of ambulance services contracts.  To the extent sharing profit is remuneration, then a "profit cap" as created by Paramedics Plus satisfies the remuneration element of the Anti-Kickback Statute.  If a "profit cap," written or unwritten, is offered or accepted with the requisite mental state under the Anti-Kickback Statute as an inducement or reward in exchange for Federal health care program business, then the Anti-Kickback Statute would prohibit that arrangement.

## <u>STATEMENT REGARDING OBJECTIONS AND ATTORNEY SIGNATURE</u>

     I hereby certify, on this 27th day of July 2017, that the objections raised in response to the interrogatories herein are made in good faith by counsel for the United States pursuant to the Federal Rules of Civil Procedure.


                  */s/ Joshua M. Russ*
                  JOSHUA M. RUSS

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General, Civil Division

BRIT FEATHERSTON
Acting U.S. Attorney, Eastern District of Texas

  /s/ Joshua M. Russ
JAMES GILLINGHAM
Assistant U.S. Attorney
Eastern District of Texas
Lead Attorney (per L.R. CV-11(a)(1))
110 N. College Street, Suite 700
Tyler, Texas 75702
E-mail: james.gillingham@usdoj.gov
(903) 590-1400
(903) 590-1436
Texas State Bar # 24065295
JOSHUA M. RUSS
Assistant U.S. Attorney
Eastern District of Texas
101 East Park Blvd., Suite 500
Plano, Texas 75074
E-mail: josh.m.russ@usdoj.gov
(972) 509-1201
(972) 509-1209 (fax)
Texas State Bar # 24074990

  /s/ Claire L. Norsetter
MICHAEL D. GRANSTON
ANDY J. MAO
CLAIRE L. NORSETTER
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Email:  Claire.L.Norsetter@usdoj.gov
(202) 307-1112
(202) 307-3852 (fax)

**ATTORNEYS FOR THE
UNITED STATES OF AMERICA**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify, on this 27th day of July 2017, I caused a true and correct copy of the foregoing to be served via electronic mail on:

CHRISTOPHER P. ROBINSON
Assistant Attorney General
Oklahoma Office of the Attorney General
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
Email: Christopher.Robinson@oag.ok.gov
(405) 522-2968
(405) 522-4875 (fax)

PATRICK J. O'CONNELL
Law Offices of Patrick J. O'Connell PLLC
2525 Wallingwood, Bldg. 14
Austin, Texas 78746
E-mail: pat@pjofca.com
(512) 852-5918

JAMES HALEY
Law Offices of Patrick J. O'Connell PLLC
2525 Wallingwood, Bldg. 14
Austin, Texas 78746
E-mail: jim@pjofca.com
(512) 852-5918

DAVID P. DEAN
James & Hoffman P.C.
1130 Connecticut Avenue, NW, Suite 950
Washington, D.C. 20036
E-mail: dpdean@jamhoff.com
(202) 496-0500
(202) 496-0555 (fax)
D.C. Bar # 437030

DANIEL ROSENTHAL
James & Hoffman P.C.
1130 Connecticut Avenue, NW, Suite 950
Washington, D.C. 20036
E-mail: dmrosenthal@jamhoff.com
(202) 496-0500
(202) 496-0555 (fax)

OTIS CARROLL
Ireland, Carroll & Kelley, P.C.

6101 S. Broadway, Suite 500
Tyler, Texas 75703
E-mail: otiscarroll@icklaw.com
(903) 561-1600
(903) 581-1071 (fax)

THOMAS JOHN WARD
Ward, Smith & Hill, PLLC
1507 Bill Owens Parkway
Longview, Texas 75604
903-757-6400
903-757-2323 (fax)
tjw@wsfirm.com

MANDY CARROLL NELSON
Ireland Carroll & Kelley
6101 S Broadway
Suite 500
Tyler, Texas 75703
(903) 561-1600
(903) 581-1071 (fax)
mnelson@icklaw.com

MICHAEL C. COKER
Adams & Coker, P.C.
4540 Kinsey Drive
Tyler, Texas 75703
(903) 581-1196
(903) 581-1407 (fax)
mikecoker@adams-coker.com

MICHAEL YOUNG
Sanders, O'Hanlon, Motley & Young
111 S. Travis Street
Sherman, TX 75090
(903) 892-9133
Michael.young@somlaw.net

SCOTT STEVENS
Stevens Henry, PLLC
222 N. Fredonia Street
P O Box 3427
Longview, Texas 75606
(903) 753-6760
(903) 753-6761 (fax)
scott@stevenshenry.com

DAVID HENRY
Stevens Henry, PLLC
222 N. Fredonia Street
P O Box 3427
Longview, Texas 75606
(903) 753-6760
(903) 753-6761 (fax)
david@stevenshenry.com

PAUL COGGINS
Locke Lord LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
E-mail: pcoggins@lockelord.com
(214) 740-8104
(214) 756-8104 (fax)

BRENDAN GAFFNEY
Locke Lord LLP - Dallas
2200 Ross Ave, Suite 2800
Dallas, Texas 75201-6776
(214) 740-8616
(214) 756-8616 (fax)
bgaffney@lockelord.com

SARAH Q. WIRSKYE
Meadows Collier
901 Main Street, Suite 3700
Dallas, Texas 75202
swirskye@meadowscollier.com
(214) 744-3700
(214) 747-3732 (fax)

CHARLES M. MEADOWS, JR.
Meadows Collier
901 Main Street, Suite 3700
Dallas, Texas 75202
cmeadows@meadowscollier.com
(214) 744-3700
(214) 747-3732 (fax)

MICHAEL ANTHONY VILLA, JR.
Meadows Collier
901 Main Street, Suite 3700
Dallas, Texas 75202

mvilla@meadowscollier.com
(214) 744-3700
(214) 747-3732 (fax)


_/s/ Joshua M. Russ_____
JOSHUA M. RUSS

## <u>VERIFICATION</u>

I verify under penalty of perjury that Plaintiff United States of America's responses to Defendant Paramedics Plus, LLC's First Set of Interrogatories are true and correct.

_Ann Williams_
_____
Ann Williams

_7/27/17_
_____
Date