**EXHIBIT B**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| and STATE OF OKLAHOMA *ex rel.* | § | |
| STEPHEN DEAN, | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 4:14-CV-203 |
| | § | |
| v. | § | Judge Mazzant |
| | § | |
| PARAMEDICS PLUS, LLC, | § | |
| EAST TEXAS MEDICAL | § | |
| CENTER REGIONAL HEALTHCARE | § | |
| SYSTEM, INC., EAST TEXAS MEDICAL | § | |
| CENTER REGIONAL HEALTH | § | |
| SERVICES, INC., EMERGENCY | § | |
| MEDICAL SERVICES AUTHORITY, | § | |
| and HERBERT STEPHEN WILLIAMSON, | § | |
| | § | |
| Defendants. | § | |

## UNITED STATES OF AMERICA'S RESPONSES AND OBJECTIONS TO PARAMEDICS PLUS, LLC'S FIRST SET OF REQUESTS FOR ADMISSION

Pursuant to Federal Rule of Civil Procedure 36 and the Court's Rules and Orders, the United States serves these Responses and Objections to Paramedics Plus, LLC's First Set of Requests for Admission.

## GENERAL OBJECTIONS

The United States reserves its right to supplement its responses herein as fact discovery proceeds.  The United States further objects on the grounds of irrelevance to Paramedics Plus, LLC's First Set of Requests for Admission to the extent they seek information unrelated to the conduct among the ETMC Defendants, EMSA, and Williamson.

## <u>RESPONSES TO REQUESTS FOR ADMISSION</u>

1.      Admit that PMP made no payment of money to Williamson.

**<u>RESPONSE</u>:** Denied.


2.      Admit that the ETMC System made no payment of money to Williamson.

**<u>RESPONSE</u>:** Denied.


3.      Admit that ETMC Services made no payment of money to Williamson.

**<u>RESPONSE</u>:** Denied.


4.      Admit that PMP paid no remuneration to Williamson.

**<u>RESPONSE</u>:** Denied.


5.      Admit that the ETMC System paid no remuneration to Williamson.

**<u>RESPONSE</u>:** Denied.


6.      Admit that ETMC Services paid no remuneration to Williamson.

**<u>RESPONSE</u>:** Denied.


7.      Admit that the Government has contended that ETMC and PMP "paid millions of dollars in bribes to EMSA and Williamson." *See* Complaint at ¶10.

**<u>RESPONSE</u>:** Admitted.


8.      Admit that the Government's contention that ETMC and PMP "paid millions of dollars in bribes to EMSA and Williamson" is false.

**<u>RESPONSE</u>:** Denied.

9.      Admit that the Government has contended that "the new ETMC-created company would kick back part of its proceeds to EMSA and Williamson." *See* Complaint at ¶7.

**RESPONSE:** Admitted.

10.      Admit that ETMC or PMP did not kick back part of its proceeds to Williamson.

**RESPONSE:** Denied.

11.      Admit that the Government's contention that "the new ETMC-created company would kick back part of its proceeds to EMSA and Williamson" is false.

**RESPONSE:** Denied.

12.      Admit that the Government has contended that "ETMC and Paramedics Plus paid kickbacks to EMSA and Williamson on a haphazard schedule." *See* Complaint at ¶70.

**RESPONSE:** Admitted.

13.      Admit that ETMC and PMP did not pay any kickbacks to Williamson.

**RESPONSE:** Denied.

14.      Admit that the Government's contention that "ETMC and Paramedics Plus kickbacks to EMSA and Williamson on a haphazard schedule" is false.

**RESPONSE:** Denied.

15.       Admit that PMP made no payment of money directly to an employee of EMSA.

**RESPONSE:** Denied.

16.     Admit that the ETMC System made no payment of money directly to an employee of EMSA.

**RESPONSE:** Denied.

17.     Admit that ETMC Services made no payment of money directly to an employee of EMSA.

**RESPONSE:** Denied.

18.     Admit that the Government became aware that PMP had a profit-cap agreement with EMSA in 2014.

**RESPONSE:** The United States objects to this Request for Admission as it is vague and ambiguous.  The United States cannot determine whether "in 2014" relates to the date of the Government's knowledge or the date of the PMP profit-cap arrangement with EMSA.  Accordingly, the United States denies this request.

19.     Admit that the Government became aware that PMP had a profit-cap agreement with EMSA before 2014.

**RESPONSE:** The United States objects to this Request for Admission as it is vague and ambiguous.  The United States cannot determine whether "before 2014" relates to the date of the Government's knowledge or the date of the PMP profit-cap arrangement with EMSA.  Accordingly, the United States denies this request.

20.     Admit that the Government became aware of the alleged "kickback scheme" described in the Complaint in 2014.

**RESPONSE:** Denied.

21.     Admit that the Government became aware of the alleged "kickback scheme" described in the Complaint before 2014.

**RESPONSE:** Denied.

22.     Admit that the Government has contended that ETMC and PMP offered "similar kickback deals to public entities in California, Florida, and Indiana." *See* Complaint at ¶11.

**RESPONSE:** Admitted.

23.     Admit that the Government has contended that it has certain civil and common law claims against the County of Alameda ("Alameda") arising out of Alameda's award of the exclusive right to provide ambulance services in Alameda County, California to PMP. *See* Bates No. USA_0015748.

**RESPONSE:** The United States denies that it has made this contention in its Complaint in Partial Intervention.  The United States admits it made this contention in a settlement agreement with Alameda County.

24.     Admit that the Government has contended that Alameda's decision to award the exclusive ambulance services contract to PMP was influenced by PMP's offer of remuneration to Alameda. *See* Bates No. USA_0015748.

**RESPONSE:** The United States denies that it has made this contention in its Complaint in Partial Intervention.  The United States admits it made this contention in a settlement agreement with Alameda County.

25.     Admit that the Government has contended that, from 2011 through the present, the ambulance services contract between PMP and Alameda included a "profit cap" term under which PMP improperly offered to Alameda any profit over a specified threshold. *See* Bates No. USA_0015748-49.

**RESPONSE:** The United States denies that it has made this contention in its Complaint in Partial Intervention.  The United States admits it made this contention in a settlement agreement with Alameda County.  The settlement agreement was effective April 5, 2017.  The United States denies this request to the extent "the present" refers to a date after April 5, 2017.

26.     Admit that the Government has contended that it was improper for Alameda to accept the profit cap provision that appears in section 84.2 of the June 2010 Emergency Medical Services Ambulance Transport Provider Agreement between PMP and Alameda, which provides that PMP will disburse to Alameda any profits it earns under the contract in excess of the profit cap. *See* Bates No. USA_0015749.

**RESPONSE:** The United States denies that it has made this contention in its Complaint in Partial Intervention.  The United States admits it made this contention in a settlement agreement with Alameda County.

27.     Admit that the Government has entered into a Settlement Agreement with the County of Alameda ("Alameda") wherein it contends that:

a.   it has certain civil and common law claims against the County of Alameda ("Alameda") arising out of Alameda's award of the exclusive right to provide ambulance services in Alameda County, California to PMP.

b.   Alameda's decision to award the exclusive ambulance services contract to PMP was influenced by PMP's offer of remuneration to Alameda. Specifically, from 2011 through the present, the ambulance services contract between PMP and Alameda included a "profit cap" term under which PMP improperly offered to Alameda any profit over a specified threshold (the "Profit Cap").

c.   it was improper for Alameda to accept the profit cap provision that appears in section 84.2 of the June 2010 Emergency Medical Services Ambulance Transport Provider Agreement between PMP and Alameda, which provides that PMP will disburse to Alameda any profits it earns under the contract in excess of the profit cap.

*See* Bates No. USA_0015748-49.

**RESPONSE:** The United States admits it entered into a settlement agreement with Alameda County arising out of the filing of Relator's *qui tam* action.  The United States admits it made

these contentions in the settlement agreement with Alameda County.  The settlement agreement was effective April 5, 2017.  The United States denies this request to the extent "the present" refers to a date after April 5, 2017.

28.     Admit that the Government became aware that PMP had a profit-cap agreement with Alameda County at least as of October 3, 2013 when Relator Stephen Dean "voluntarily disclosed substantially all material evidence and information that he possessed on the fraudulent kickback scheme conducted by PMP and EMSA in Oklahoma, Florida and California by serving a disclosure statement and exhibits on Eric Holder, the Attorney General of the United States and on Kevin McClendon, Assistant U.S. Attorney for the Eastern District of Texas." *See* Dean's FAC at ¶9.

**RESPONSE:** Denied.  The United States became aware on October 3, 2013 that Relator alleged Paramedics Plus had a profit-cap agreement with Alameda County.

29.     Admit that the Government became aware that PMP had a profit-cap agreement with Alameda County at least as of April 4, 2014, when Relator Stephen Dean's False Claims Act Complaint was on file.

**RESPONSE:** Denied.  The United States became aware at least as of April 4, 2014 that Relator alleged Paramedics Plus had a profit-cap agreement with Alameda County.

30.     Admit that the Government became aware that PMP had a profit-cap agreement with Alameda County at least as of January 12, 2015, when PMP responded to the CID issued by the Government and produced the PMP/Alameda County Agreement containing a profit cap provision.

**RESPONSE:** Admitted.

31.     Admit that the Government continued to pay or authorize payment of Medicare claims submitted by or on behalf of Alameda County after it became aware that PMP had a profit-cap agreement with Alameda County.

**RESPONSE:**  The United States objects to this request because it is confusing and misleading. The United States admits it continued to pay or authorize payment of some Medicare claims submitted by or on behalf of Alameda County during its investigation.  However, the United States also required Alameda County, as part of its settlement, to agree not to resubmit any previously denied claims related to the Covered Conduct as defined in the parties' settlement.  In addition, not all claims submitted by or on behalf of Alameda County during this time period were paid.

32.     Admit that the Government continued to pay or authorize payment of Medicaid claims submitted by or on behalf of Alameda County after the Government became aware that Alameda County had a profit-cap agreement with PMP.

**RESPONSE:**  Denied.

33.     Admit that the Government continued to pay or authorize payment of Medicare claims submitted by or on behalf of Alameda County after October 3, 2013.

**RESPONSE:**  The United States objects to this request because it is confusing and misleading. The United States admits it continued to pay or authorize payment of some Medicare claims submitted by or on behalf of Alameda County during its investigation.  However, the United States also required Alameda County, as part of its settlement, to agree not to resubmit any previously denied claims related to the Covered Conduct as defined in the parties' settlement.  In addition, not all claims submitted by or on behalf of Alameda County during this time period were paid.

34.     Admit that the Government continued to pay or authorize payment of Medicare claims submitted by or on behalf of Alameda County after April 4, 2014.

**RESPONSE:**  The United States objects to this request because it is confusing and misleading. The United States admits it continued to pay or authorize payment of some Medicare claims submitted by or on behalf of Alameda County during its investigation.  However, the United States also required Alameda County, as part of its settlement, to agree not to resubmit any previously denied claims related to the Covered Conduct as defined in the parties' settlement.  In

addition, not all claims submitted by or on behalf of Alameda County during this time period were paid.

35.     Admit that the Government continued to pay or authorize payment of Medicare claims submitted by or on behalf of Alameda County after January 12, 2015.

**RESPONSE:**  The United States objects to this request because it is confusing and misleading. The United States admits it continued to pay or authorize payment of some Medicare claims submitted by or on behalf of Alameda County during its investigation.  However, the United States also required Alameda County, as part of its settlement, to agree not to resubmit any previously denied claims related to the Covered Conduct as defined in the parties' settlement.  In addition, not all claims submitted by or on behalf of Alameda County during this time period were paid.

36.     Admit that the Government continued to authorize payment of Medicaid claims submitted by or on behalf of Alameda County after October 3, 2013.

**RESPONSE:**  Denied.

37.     Admit that the Government continued to authorize payment of Medicaid claims submitted by or on behalf of Alameda County after April 4, 2014.

**RESPONSE:**  Denied.

38.     Admit that the Government continued to authorize payment of Medicaid claims submitted by or on behalf of Alameda County after January 12, 2015.

**RESPONSE:**  Denied.

39.     Admit that the Government has not denied payment of a Medicare claim submitted by or on behalf of Alameda County because of the profit-cap agreement between PMP and Alameda County.

**RESPONSE:**  Denied.

40.     Admit that the Government has not denied payment of a Medicaid claim submitted by or on behalf of Alameda County because of the profit-cap agreement between PMP and Alameda County.

**RESPONSE:** Denied.


41.     Admit that the Government has not denied payment of a Medicare claim submitted by or on behalf of Alameda County because of the profit-cap agreement between PMP and Alameda County despite actual knowledge of the profit-cap agreement.

**RESPONSE:**  Denied.


42.     Admit that the Government has not denied payment of a Medicaid claim submitted by or on behalf of Alameda County because of the profit-cap agreement between PMP and Alameda County despite actual knowledge of the profit-cap agreement.

**RESPONSE:** Denied.


43.     Admit that the Government has contended that Pinellas County Emergency Medical Services Authority ("Pinellas EMSA") submitted or caused to be submitted claims for payment to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-l ("Medicare") and the Medicaid Program, 42 U.S.C. §§ 1396-1396w-5 ("Medicaid"). *See* Bates No. USA_0015998.

**RESPONSE:** The United States denies that it has made this contention in its Complaint in Partial Intervention.  The United States admits it made this contention in a settlement agreement with Pinellas EMA.

44.     Admit that the Government has contended they have certain civil and common law claims against Pinellas EMSA arising out of Pinellas EMSA' s award of the exclusive right to provide ambulance services in Pinellas County, Florida to Paramedics Plus, L.L.C. ("Paramedics Plus"). *See* Bates No. USA_0015999.

**RESPONSE:** The United States denies that it has made this contention in its Complaint in Partial Intervention.  The United States admits it made this contention in a settlement agreement with Pinellas EMA.

45.     Admit that the Government has contended that Pinellas EMSA's decision to award the exclusive ambulance services contract to Paramedics Plus was improperly influenced by Paramedics Plus's offer and payment of remuneration to Pinellas EMSA: specifically, from 2004 through September 30, 2015, the ambulance services contract between Paramedics Plus and Pinellas EMSA included a "profit cap" term under which Paramedics Plus improperly offered and paid to Pinellas EMSA any profit over a specified threshold. *See* Bates No. USA_0015999.

**RESPONSE:** The United States denies that it has made this contention in its Complaint in Partial Intervention.  The United States admits it made this contention in a settlement agreement with Pinellas EMA.

46.     Admit that the Government has entered into a settlement agreement with wherein it contends that:

a.    Pinellas County Emergency Medical Services Authority ("Pinellas EMSA") submitted or caused to be submitted claims for payment to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-l ("Medicare") and the Medicaid Program, 42 U.S.C. §§ 1396-1396w-5 ("Medicaid");

    b.   The Government has certain civil and common law claims against Pinellas EMSA arising out of Pinellas EMSA' s award of the exclusive right to provide ambulance services in Pinellas County, Florida to Paramedics Plus, L.L.C. ("Paramedics Plus"); and

    c.   Pinellas EMSA's decision to award the exclusive ambulance services contract to Paramedics Plus was improperly influenced by Paramedics Plus's offer and payment of remuneration to Pinellas EMSA: specifically, from 2004 through September 30, 2015, the ambulance services contract between Paramedics Plus and Pinellas EMSA included a "profit cap" term under which Paramedics Plus improperly offered and paid to Pinellas EMSA any profit over a specified threshold.

    *See* Bates No. USA_0015998-99.

**RESPONSE:**  The United States admits it entered into a settlement agreement with Pinellas EMSA arising out of the filing of Relator's *qui tam* action.  The United States admits it made this contention in a settlement agreement with Pinellas EMA.


    47.   Admit that the Government became aware that PMP had a profit-cap agreement with Pinellas EMSA at least as of October 3, 2013 when Relator Stephen Dean "voluntarily disclosed substantially all material evidence and information that he possessed on the fraudulent kickback scheme conducted by Paramedics Plus and EMSA in Oklahoma, Florida and California by serving a disclosure statement and exhibits on Eric Holder, the Attorney General of the United States and on Kevin McClendon, Assistant U.S. Attorney for the Eastern District of Texas." *See* Dean's FAC at ¶9.

**RESPONSE:**  Denied.  The United States became aware at least as of October 3, 2013 that Relator alleged Paramedics Plus had a profit-cap agreement with Pinellas EMSA.

48.    Admit that the Government became aware that PMP had a profit-cap agreement with Pinellas EMSA at least as of April 4, 2014, when Dean's POC was on file.

**RESPONSE:** The United States objects to this request because it is confusing.  The United States became aware at least as of April 4, 2014 that Relator alleged Paramedics Plus had a profit-cap agreement with Pinellas EMSA.

49.    Admit that the Government became aware that PMP had a profit-cap agreement with Pinellas EMSA at least as of January 12, 2015, when Paramedics Plus responded to the CID issued by the Government and produced the PMP/Pinellas EMSA Agreement containing a profit cap provision.

**RESPONSE:** Admitted.

50.    Admit that the Government became aware that PMP had returned $35,600 to Pinellas EMSA under the profit-cap agreement with Pinellas EMSA at least as of January 12, 2015, when Paramedics Plus responded to the CID issued by the Government and produced the statement found at Bates No. PP0761.

**RESPONSE:** Admitted.

51.    Admit that the Government continued to pay or authorize payment of Medicare claims submitted by or on behalf of Pinellas EMSA after the Government became aware that Pinellas EMSA had a profit-cap agreement with PMP.

**RESPONSE:** The United States objects to this request because it is confusing and misleading. The United States admits it continued to pay or authorize payment of some Medicare claims submitted by or on behalf of Pinellas EMSA during its investigation.  However, the United States also required Pinellas EMSA, as part of its settlement, to agree not to resubmit any previously denied claims related to the Covered Conduct as defined in the parties' settlement.  In addition, not all claims submitted by or on behalf of Pinellas EMSA during this time period were paid.

52.     Admit that the Government continued to pay or authorize payment of Medicaid claims submitted by or on behalf of Pinellas EMSA after the Government became aware that Pinellas EMSA had a profit-cap agreement with PMP.

**RESPONSE:** Denied.

53.     Admit that the Government continued to pay or authorize payment of Medicare claims submitted by or on behalf of Pinellas EMSA after October 3, 2013.

**RESPONSE:** The United States objects to this request because it is confusing and misleading. The United States admits it continued to pay or authorize payment of some Medicare claims submitted by or on behalf of Pinellas EMSA during its investigation.  However, the United States also required Pinellas EMSA, as part of its settlement, to agree not to resubmit any previously denied claims related to the Covered Conduct as defined in the parties' settlement.  In addition, not all claims submitted by or on behalf of Pinellas EMSA during this time period were paid.

54.     Admit that the Government continued to pay or authorize payment of Medicare claims submitted by or on behalf of Pinellas EMSA after April 4, 2014.

**RESPONSE:** The United States objects to this request because it is confusing and misleading. The United States admits it continued to pay or authorize payment of some Medicare claims submitted by or on behalf of Pinellas EMSA during its investigation.  However, the United States also required Pinellas EMSA, as part of its settlement, to agree not to resubmit any previously denied claims related to the Covered Conduct as defined in the parties' settlement.  In addition, not all claims submitted by or on behalf of Pinellas EMSA during this time period were paid.

55.     Admit that the Government continued to pay or authorize payment of Medicare claims submitted by or on behalf of Pinellas EMSA after January 12, 2015.

**RESPONSE:** The United States objects to this request because it is confusing and misleading. The United States admits it continued to pay or authorize payment of some Medicare claims submitted by or on behalf of Pinellas EMSA during its investigation.  However, the United States also required Pinellas EMSA, as part of its settlement, to agree not to resubmit any previously denied claims related to the Covered Conduct as defined in the parties' settlement.  In

addition, not all claims submitted by or on behalf of Pinellas EMSA during this time period were paid.

56.     Admit that the Government continued to pay or authorize payment of Medicaid claims submitted by or on behalf of Pinellas EMSA after October 3, 2013.

**RESPONSE:** Denied.

57.     Admit that the Government continued to pay or authorize payment of Medicaid claims submitted by or on behalf of Pinellas EMSA after April 4, 2014.

**RESPONSE:** Denied.

58.     Admit that the Government continued to pay or authorize payment of Medicaid claims submitted by or on behalf of Pinellas EMSA after January 12, 2015.

**RESPONSE:** Denied.

59.     Admit that the Government has not denied payment of a Medicare claim submitted by or on behalf of Pinellas County because of the profit-cap agreement between PMP and Pinellas County.

**RESPONSE:**  Denied.

60.     Admit that the Government has not denied payment of a Medicaid claim submitted by or on behalf of Pinellas County because of the profit-cap agreement between PMP and Pinellas County.

**RESPONSE:** Denied.

61.     Admit that the Government has not denied payment of a Medicare claim submitted by or on behalf of Pinellas County because of the profit-cap agreement between PMP and Pinellas County despite actual knowledge of the profit-cap agreement.

**RESPONSE:**  Denied.

62.     Admit that the Government has not denied payment of a Medicaid claim submitted by or on behalf of Pinellas County because of the profit-cap agreement between PMP and Pinellas County despite actual knowledge of the profit-cap agreement.

**RESPONSE:**  Denied.

63.     Admit that the Government has not denied payment of a Medicare claim submitted by or on behalf of Pinellas County because PMP returned money to Pinellas EMSA under the Profit Cap Agreement.

**RESPONSE:**  Denied.

64.     Admit that the Government has not denied payment of a Medicaid claim submitted by or on behalf of Pinellas County because PMP returned money to Pinellas EMSA under the Profit Cap Agreement.

**RESPONSE:**  Denied.

65.     Admit that the Government has not denied payment of a Medicare claim submitted by or on behalf of Pinellas County because PMP returned money to Pinellas EMSA under the Profit Cap Agreement despite actual knowledge that PMP returned money to Pinellas EMSA under the Profit Cap Agreement.

**RESPONSE:**  Denied.

66.     Admit that the Government has not denied payment of a Medicaid claim submitted by or on behalf of Pinellas County because PMP returned money to Pinellas EMSA under the Profit Cap Agreement despite actual knowledge that PMP returned money to Pinellas EMSA under the Profit Cap Agreement.

**RESPONSE:** Denied.

67.     Admit that the Government became aware that PMP had a profit-cap agreement with Three Rivers at least as of March 25, 2015, when Relator Stephen Dean served "a supplemental disclosure statement to include substantially all material evidence and information that he possesses concerning the fraudulent scheme conducted by Paramedics Plus in Indiana and AMR's fraudulent schemes in Oklahoma, by serving a Third Supplement to Amended Confidential Disclosure Statement and exhibits to Mr. Holder and Mr. McClendon, as well as to the California Attorney General, the Florida Attorney General, CFO of the Florida Department of Financial Services Jeff Atwater, the Oklahoma Attorney General (Attention Medicaid Fraud Control Unit), the Indiana Attorney General, and the Indiana Office of the Inspector General." *See* Dean's FAC at ¶10.

**RESPONSE:** Denied.

68.     Admit that the Government became aware that PMP had a profit-cap agreement with Three Rivers at least as of April 7, 2015, when Dean's FAC was on file.

**RESPONSE:** Denied.

69.     Admit that the Government became aware that PMP had a profit-cap agreement with Three Rivers at least as of January 12, 2015, when Paramedics Plus responded to the CID issued by the Government and produced the PMP/Three Rivers Agreement.

**RESPONSE:** Denied.

70.     Admit that the Government continued to pay or authorize payment of Medicare claims submitted by or on behalf of Three Rivers after the Government became aware that Three Rivers had a profit-cap agreement with PMP.

**RESPONSE:** Denied.

71.     Admit that the Government continued to pay or authorize payment of Medicaid claims submitted by or on behalf of Three Rivers after the Government became aware that Three Rivers had a profit-cap agreement with PMP.

**RESPONSE:** Denied.

72.     Admit that the Government continued to pay or authorize payment of Medicare claims submitted by or on behalf of Three Rivers after March 25, 2015.

**RESPONSE:** The United States objects to this request because it is confusing and misleading. The United States admits it continued to pay or authorize payment of some Medicare claims submitted by or on behalf of Three Rivers during this time period.  However, not all claims submitted by or on behalf of Three Rivers during this time period were paid.

73.     Admit that the Government continued to pay or authorize payment of Medicare claims submitted by or on behalf of Three Rivers after April 7, 2015.

**RESPONSE:** The United States objects to this request because it is confusing and misleading. The United States admits it continued to pay or authorize payment of some Medicare claims submitted by or on behalf of Three Rivers during this time period.  However, not all claims submitted by or on behalf of Three Rivers during this time period were paid.

74.     Admit that the Government continued to pay or authorize payment of Medicare claims submitted by or on behalf of Three Rivers after January 12, 2015.

**RESPONSE:**  The United States objects to this request because it is confusing and misleading. The United States admits it continued to pay or authorize payment of some Medicare claims submitted by or on behalf of Three Rivers during this time period.  However, not all claims submitted by or on behalf of Three Rivers during this time period were paid.

75.     Admit that the Government continued to pay or authorize payment of Medicaid claims submitted by or on behalf of Three Rivers after March 25, 2015.

**RESPONSE:**  Denied.

76.     Admit that the Government continued to pay or authorize payment of Medicaid claims submitted by or on behalf of Three Rivers after April 7, 2015.

**RESPONSE:**  Denied.

77.     Admit that the Government continued to pay or authorize payment of Medicaid claims submitted by or on behalf of Three Rivers after January 12, 2015.

**RESPONSE:**  Denied.

78.     Admit that the Government has not denied payment of a Medicare claim submitted by or on behalf of Three Rivers because of the profit-cap agreement between PMP and Three Rivers.

**RESPONSE:**  The United States objects to this request because it is confusing and misleading. The United States' investigation showed that Paramedics Plus offered a profit-cap arrangement to Three Rivers.  However, Three Rivers contended that any profit cap offer was not incorporated into a contract between Three Rivers and Paramedics Plus to the extent it violated the Anti-Kickback Statute.  This request assumes there is an agreement in place between Paramedics Plus and Three Rivers to cap profits, which appears is not certain.

79.     Admit that the Government has not denied payment of a Medicaid claim submitted by or on behalf of Three Rivers because of the profit-cap agreement between PMP and Three Rivers.

**RESPONSE:** The United States objects to this request because it is confusing and misleading. The United States' investigation showed that Paramedics Plus offered a profit-cap arrangement to Three Rivers.  However, Three Rivers contended that any profit cap offer was not incorporated into a contract between Three Rivers and Paramedics Plus to the extent it violated the Anti-Kickback Statute.  This request assumes there is an agreement in place between Paramedics Plus and Three Rivers to cap profits, which appears is not certain.

80.     Admit that the Government has not denied payment of a Medicare claim submitted by or on behalf of Three Rivers because of the profit-cap agreement between PMP and Three Rivers despite actual knowledge of the profit-cap agreement.

**RESPONSE:** The United States objects to this request because it is confusing and misleading. The United States' investigation showed that Paramedics Plus offered a profit-cap arrangement to Three Rivers.  However, Three Rivers contended that any profit cap offer was not incorporated into a contract between Three Rivers and Paramedics Plus to the extent it violated the Anti-Kickback Statute.  This request assumes there is an agreement in place between Paramedics Plus and Three Rivers to cap profits, which appears is not certain.

81.     Admit that the Government has not denied payment of a Medicaid claim submitted by or on behalf of Three Rivers because of the profit-cap agreement between PMP and Three Rivers despite actual knowledge of the profit-cap agreement.

**RESPONSE:** The United States objects to this request because it is confusing and misleading. The United States' investigation showed that Paramedics Plus offered a profit-cap arrangement to Three Rivers.  However, Three Rivers contended that any profit cap offer was not incorporated into a contract between Three Rivers and Paramedics Plus to the extent it violated the Anti-Kickback Statute.  This request assumes there is an agreement in place between Paramedics Plus and Three Rivers to cap profits, which appears is not certain.

82.    Admit that the Government became aware that AMR had a profit-cap agreement with EMSA at least as of October 3, 2013 when Relator Stephen Dean "voluntarily disclosed substantially all material evidence and information that he possessed on the fraudulent kickback scheme conducted by Paramedics Plus and EMSA in Oklahoma, Florida and California by serving a disclosure statement and exhibits on Eric Holder, the Attorney General of the United States and on Kevin McClendon, Assistant U.S. Attorney for the Eastern District of Texas." *See* Dean's FAC at ¶9.

**RESPONSE:** Denied.

83.    Admit that the Government became aware that AMR had a profit-cap agreement with EMSA at least as of at least as of than April 4, 2014, when Dean's FAC was on file.

**RESPONSE:**  The United States objects to this request as it is confusing as written.  Denied. The United States became aware as of April 4, 2014 that Relator alleged AMR had a profit-cap agreement with EMSA.

84.    Admit that the Government continued to pay or authorize payment of Medicare claims submitted by or on behalf of EMSA after the Government became aware that AMR had a profit-cap agreement with EMSA.

**RESPONSE:**  The United States objects to this request because it is confusing and misleading. The United States admits it continued to pay or authorize payment of some Medicare claims submitted by or on behalf of EMSA during this time period.  However, not all claims submitted by or on behalf of EMSA during this time period were paid

85.    Admit the Government continued to pay or authorize payment of Medicaid claims submitted by or on behalf of EMSA after the Government became aware that AMR had a profit-cap agreement with EMSA.

**RESPONSE:** Denied.

86.     Admit that the Government has not denied payment of a Medicare claim submitted by or on behalf of EMSA because of the profit-cap agreement between EMSA and AMR.

**RESPONSE:** Admitted.

87.     Admit that the Government has not denied payment of a Medicaid claim submitted by or on behalf of EMSA because of the profit-cap agreement between EMSA and AMR.

**RESPONSE:** Admitted.

88.     Admit that the Government has not denied payment of a Medicare claim submitted by or on behalf of EMSA because of the profit-cap agreement between EMSA and AMR despite actual knowledge of the profit-cap agreement between EMSA and AMR.

**RESPONSE:** Admitted.

89.     Admit that the Government has not denied payment of a Medicaid claim submitted by or on behalf of EMSA because of the profit-cap agreement between EMSA and AMR despite actual knowledge of the profit-cap agreement between EMSA and AMR.

**RESPONSE:** Admitted.

90.     Admit that the Government has not denied payment of a Medicare claim because of a profit-cap agreement.

**RESPONSE:** Denied.

91.     Admit that the Government has not denied payment of a Medicaid claim because of a profit-cap agreement.

**RESPONSE:** Denied.

92.     Admit that the Government has alleged that it was: "unaware of Defendants' conduct until the United States investigated the allegations brought by Relator Stephen Dean. Mr. Dean filed this action in 2014. Paramedics Plus had already lost the EMSA contract at that point. Had HHS learned of Defendants' illegal conduct during the time Paramedics Plus was performing ambulance services for EMSA, HHS would have ceased making payments to EMSA." *See* Complaint at ¶152.

**RESPONSE:** Admitted.


93.     Admit that the AKS does not prohibit profit-cap agreements.

**RESPONSE:** The United States objects to this request because it calls for a legal conclusion and is misleading as to the elements of an Anti-Kickback Statute violation.  Paramedics Plus appears to have created the term "profit cap" for purposes of ambulance services contracts.  To the extent sharing profit is remuneration, then a "profit cap" as created by Paramedics Plus satisfies the remuneration element of the Anti-Kickback Statute.  If a "profit cap" is offered or accepted with the requisite mental state under the Anti-Kickback Statute as an inducement or reward in exchange for Federal health care program business, then the Anti-Kickback Statute would prohibit that arrangement.


94.     Admit that the AKS prohibits profit-cap agreements.

**RESPONSE:** The United States objects to this request because it calls for a legal conclusion and is misleading as to the elements of an Anti-Kickback Statute violation.  Paramedics Plus appears to have created the term "profit cap" for purposes of ambulance services contracts.  To the extent sharing profit is remuneration, then a "profit cap" as created by Paramedics Plus satisfies the remuneration element of the Anti-Kickback Statute.  If a "profit cap" is offered or accepted with the requisite mental state under the Anti-Kickback Statute as an inducement or reward in exchange for Federal health care program business, then the Anti-Kickback Statute would prohibit that arrangement.


95.     Admit that the AKS does not prohibit unwritten profit-cap agreements.

**RESPONSE:** The United States objects to this request because it calls for a legal conclusion and is misleading as to the elements of an Anti-Kickback Statute violation.  Paramedics Plus appears to have created the term "profit cap" for purposes of ambulance services contracts.  To the extent

sharing profit is remuneration, then a "profit cap" as created by Paramedics Plus satisfies the remuneration element of the Anti-Kickback Statute.  If a "profit cap" is offered or accepted with the requisite mental state under the Anti-Kickback Statute as an inducement or reward in exchange for Federal health care program business, then the Anti-Kickback Statute would prohibit that arrangement.

    96.    Admit that the AKS prohibits unwritten profit-cap agreements.

**RESPONSE:**  The United States objects to this request because it calls for a legal conclusion and is misleading as to the elements of an Anti-Kickback Statute violation.  Paramedics Plus appears to have created the term "profit cap" for purposes of ambulance services contracts.  To the extent sharing profit is remuneration, then a "profit cap" as created by Paramedics Plus satisfies the remuneration element of the Anti-Kickback Statute.  If a "profit cap" is offered or accepted with the requisite mental state under the Anti-Kickback Statute as an inducement or reward in exchange for Federal health care program business, then the Anti-Kickback Statute would prohibit that arrangement.

    97.    Admit that PMP made no false representations to the Government pertaining to the profit-cap agreement between PMP and EMSA.

**RESPONSE:**  Denied.

    98.    Admit that the ETMC System made no false representations to the Government pertaining to the profit-cap agreement between PMP and EMSA.

**RESPONSE:**  Denied.

    99.    Admit that ETMC Services made no false representations to the Government pertaining to the profit-cap agreement between PMP and EMSA.

**RESPONSE:**  Denied.

    100.    Admit that PMP made no false representations regarding compliance with the AKS pertaining to services that PMP provided for EMSA.

**RESPONSE:**  Denied.

101.    Admit that the ETMC System made no false representations regarding compliance with the AKS pertaining to services that PMP provided for EMSA.

**RESPONSE:** Denied.

102.    Admit that ETMC Services made no false representations regarding compliance with the AKS pertaining to services that PMP provided for EMSA.

**RESPONSE:** Denied.

103.    Admit that the profit-cap agreement between PMP and EMSA was disclosed to the Oklahoma State Auditor at least as of December 6, 2012. *See* Bates No. EMSA_TX00015431-33.

**RESPONSE:** Denied.

104.    Admit that the Government has had one or more profit-cap agreements with third-party contractors since 1997.

**RESPONSE:** The United States denies that it has ever had a profit cap agreement as EMSA and Paramedics Plus use that phrase in this litigation.

105.    Admit that the Government has had one or more cost-plus agreements with third-party contractors since 1997.

**RESPONSE:** Admitted.

106.    Admit that the Government does not complain in this case about the quality of the services that PMP rendered for or on behalf of EMSA.

**RESPONSE:** Denied.

107.    Admit that the Government does not complain in this case about the necessity of the services that PMP rendered for or on behalf of EMSA.

**RESPONSE**: Denied.

108.    Admit that the Government does not complain in this case about the amount charged for services that PMP rendered for or on behalf of EMSA.

**RESPONSE**: Denied.

109.    Admit that the Government has no evidence of any medically unnecessary transports made by PMP for EMSA from October 26, 1998 to November 1, 2013.

**RESPONSE**: Denied.

110.    Admit that the Government was billed at the appropriate Medicare rate for all transports made by PMP for EMSA from October 26, 1998 to November 1, 2013.

**RESPONSE**: Denied.

111.    Admit that the Government conducted an HHS OIG Audit on the medical necessity of Medicare claims submitted by EMSA in 2010. *See* Bates No. PP046152-70.

**RESPONSE**:   The United States objects to this request as it seeks information outside the scope of Federal Rule of Civil Procedure 26 and is not relevant to a claim or defense in this action.

112.    Admit that the goal of the HHS OIG Audit conducted by the Government in 2010 was to determine whether ALS emergency transports billed by EMSA during 2010 met Medicare coverage requirements.  *See* Bates No. PP046152-70.

**RESPONSE**: The United States objects to this request as it seeks information outside the scope of Federal Rule of Civil Procedure 26 and is not relevant to a claim or defense in this action.

113.    Admit that the HHS OIG Audit conducted by the Government in 2010 first contended that EMSA improperly billed for at least 1,210 ALS Emergency transports with an associated overpayment of at least $365,889 and recommended that EMSA refund $365,889 to the Federal Government. *See* Bates No. PP046152-70.

**RESPONSE:** The United States objects to this request as it seeks information outside the scope of Federal Rule of Civil Procedure 26 and is not relevant to a claim or defense in this action.

114.    Admit that EMSA did refund $365,889 to the Federal Government. *See* Bates No. PP046152-70.

**RESPONSE:** The United States objects to this request as it seeks information outside the scope of Federal Rule of Civil Procedure 26 and is not relevant to a claim or defense in this action.

115.    Admit that EMSA disputed the Federal Government's contentions by way of letter from David M. Werfel on October 15, 2012 to Patricia Wheeler. *See* Bates No. PP046152-70.

**RESPONSE:** The United States objects to this request as it seeks information outside the scope of Federal Rule of Civil Procedure 26 and is not relevant to a claim or defense in this action.

116.    Admit that after David M. Werfel's letter of October 15, 2012, the Government reversed its position and acknowledged that all ALS emergency transports billed by EMSA during 2010 met Medicare coverage requirements.  *See* Bates No. PP046152-70.

**RESPONSE:** The United States objects to this request as it seeks information outside the scope of Federal Rule of Civil Procedure 26 and is not relevant to a claim or defense in this action.

117.    Admit that after David M. Werfel's letter of October 15, 2012, the Government refunded $365,889 back to EMSA. *See* Bates No. PP046152-70.

**RESPONSE:** The United States objects to this request as it seeks information outside the scope of Federal Rule of Civil Procedure 26 and is not relevant to a claim or defense in this action.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General, Civil Division

BRIT FEATHERSTON
Acting U.S. Attorney, Eastern District of Texas

  /s/ Joshua M. Russ
JAMES GILLINGHAM
Assistant U.S. Attorney
Eastern District of Texas
Lead Attorney (per L.R. CV-11(a)(1))
110 N. College Street, Suite 700
Tyler, Texas 75702
E-mail: james.gillingham@usdoj.gov
(903) 590-1400
(903) 590-1436
Texas State Bar # 24065295
JOSHUA M. RUSS
Assistant U.S. Attorney
Eastern District of Texas
101 East Park Blvd., Suite 500
Plano, Texas 75074
E-mail: josh.m.russ@usdoj.gov
(972) 509-1201
(972) 509-1209 (fax)
Texas State Bar # 24074990

  /s/ Claire L. Norsetter
MICHAEL D. GRANSTON
ANDY J. MAO
CLAIRE L. NORSETTER
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Email:  Claire.L.Norsetter@usdoj.gov
(202) 307-1112
(202) 307-3852 (fax)

**ATTORNEYS FOR THE
UNITED STATES OF AMERICA**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify, on this 27th day of July 2017, I caused a true and correct copy of the foregoing to be served via electronic mail on:

CHRISTOPHER P. ROBINSON
Assistant Attorney General
Oklahoma Office of the Attorney General
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
Email: Christopher.Robinson@oag.ok.gov
(405) 522-2968
(405) 522-4875 (fax)

PATRICK J. O'CONNELL
Law Offices of Patrick J. O'Connell PLLC
2525 Wallingwood, Bldg. 14
Austin, Texas 78746
E-mail: pat@pjofca.com
(512) 852-5918

JAMES HALEY
Law Offices of Patrick J. O'Connell PLLC
2525 Wallingwood, Bldg. 14
Austin, Texas 78746
E-mail: jim@pjofca.com
(512) 852-5918

DAVID P. DEAN
James & Hoffman P.C.
1130 Connecticut Avenue, NW, Suite 950
Washington, D.C. 20036
E-mail: dpdean@jamhoff.com
(202) 496-0500
(202) 496-0555 (fax)
D.C. Bar # 437030

DANIEL ROSENTHAL
James & Hoffman P.C.
1130 Connecticut Avenue, NW, Suite 950
Washington, D.C. 20036
E-mail: dmrosenthal@jamhoff.com
(202) 496-0500
(202) 496-0555 (fax)

OTIS CARROLL

Ireland, Carroll & Kelley, P.C.
6101 S. Broadway, Suite 500
Tyler, Texas 75703
E-mail: otiscarroll@icklaw.com
(903) 561-1600
(903) 581-1071 (fax)

THOMAS JOHN WARD
Ward, Smith & Hill, PLLC
1507 Bill Owens Parkway
Longview, Texas 75604
903-757-6400
903-757-2323 (fax)
tjw@wsfirm.com

MANDY CARROLL NELSON
Ireland Carroll & Kelley
6101 S Broadway
Suite 500
Tyler, Texas 75703
(903) 561-1600
(903) 581-1071 (fax)
mnelson@icklaw.com

MICHAEL C. COKER
Adams & Coker, P.C.
4540 Kinsey Drive
Tyler, Texas 75703
(903) 581-1196
(903) 581-1407 (fax)
mikecoker@adams-coker.com

MICHAEL YOUNG
Sanders, O'Hanlon, Motley & Young
111 S. Travis Street
Sherman, TX 75090
(903) 892-9133
Michael.young@somlaw.net

SCOTT STEVENS
Stevens Henry, PLLC
222 N. Fredonia Street
P O Box 3427
Longview, Texas 75606
(903) 753-6760

(903) 753-6761 (fax)
scott@stevenshenry.com

DAVID HENRY
Stevens Henry, PLLC
222 N. Fredonia Street
P O Box 3427
Longview, Texas 75606
(903) 753-6760
(903) 753-6761 (fax)
david@stevenshenry.com

PAUL COGGINS
Locke Lord LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
E-mail: pcoggins@lockelord.com
(214) 740-8104
(214) 756-8104 (fax)

BRENDAN GAFFNEY
Locke Lord LLP - Dallas
2200 Ross Ave, Suite 2800
Dallas, Texas 75201-6776
(214) 740-8616
(214) 756-8616 (fax)
bgaffney@lockelord.com

SARAH Q. WIRSKYE
Meadows Collier
901 Main Street, Suite 3700
Dallas, Texas 75202
swirskye@meadowscollier.com
(214) 744-3700
(214) 747-3732 (fax)

CHARLES M. MEADOWS, JR.
Meadows Collier
901 Main Street, Suite 3700
Dallas, Texas 75202
cmeadows@meadowscollier.com
(214) 744-3700
(214) 747-3732 (fax)

MICHAEL ANTHONY VILLA, JR.
Meadows Collier

901 Main Street, Suite 3700
Dallas, Texas 75202
mvilla@meadowscollier.com
(214) 744-3700
(214) 747-3732 (fax)


  _/s/ Joshua M. Russ_____
  JOSHUA M. RUSS